1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (257370)
*jack@jackfitzgeraldlaw.com*
The Palm Canyon Building
2870 Fourth Avenue, Suite 205
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
SKYE RESENDES (278511)
*skye@consumersadvocates.com*
ALEXIS M. WOOD (270200)
*alexis@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Phone: (619) 696-9006
Fax: (619) 564-6665

*Counsel for Plaintiff and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAMAR SANTISTEBAN CORTINA, on behalf of herself, all others similarly situated and the general public,<br><br>        Plaintiff,<br><br>        v.<br><br>WAL-MART, INC.,<br><br>        Defendant. | Case No. 13-cv-2054-BAS-DHB<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFF'S OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS AND STRIKE THE FIRST AMENDED COMPLAINT**<br><br>Date:      September 29, 2014<br>Judge:   Hon. Cynthia Bashant |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

FACTS ............................................................................................................... 3

REGARDING WAL-MART'S MOTION TO STRIKE ...................................... 7

ARGUMENT ...................................................................................................... 7

I.     PLAINTIFF'S FRAUD-BASED CLAIMS SATISFY RULE 9(b) ................... 7

 A. Wal-Mart Does Not Challenge Plaintiff's Allegation that Its
  Comparison to Qunol is False and Misleading ........................... 7

 B. Plaintiff Adequately Alleges Wal-Mart's Efficacy and Benefit
  Claims are False or Misleading ................................................. 8

  1. Plaintiff Adequately Pleads that Equate Does Not Meet
   Consumer Expectations Caused by its Labeling ........................... 8

  2. Plaintiff's Allegations of Equate's Rupture and
   Dissolution Failures Support Her False Advertising
   Claims ................................................................................. 11

  3. Plaintiff Alleges Equate's Advertising Claims are
   Affirmatively False ............................................................... 12

II.    PLAINTIFF ALLEGES INJURY SUFFICIENT FOR STANDING ............... 12

III.   PLAINTIFF GAVE PROPER CLRA NOTICE ................................................ 14

IV.    PLAINTIFF STATES BREACH OF WARRANTY CLAIMS
  BASED ON EQUATE'S FAILURE TO MEET ITS LABEL
  PROMISES, RATHER THAN ITS FAILURE TO SATISFY USP
  REQUIREMENTS ............................................................................. 15

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V.  BECAUSE ITS POSSIBLE THAT ARKANSAS LAW MAY APPLY
     TO THE CLAIMS OF A NATIONWIDE CLASS SINCE DOING SO
     WOULD COMPORT WITH DUE PROCESS, BUT A
     COMPREHENSIVE CHOICE-OF-LAW ANALYSIS IS NOT YET
     POSSIBLE ON THE FACTS OF THIS CASE, THE COURT
     SHOULD RESERVE THIS ISSUE FOR CLASS CERTIFICATION ............16

     A.   Applying Arkansas Law to a Nationwide Class Comports with
          Due Process ...............................................................................................17

     B.   Plaintiff Should Not Be Required to Make a Full Choice-of-
          Law Analysis in Opposing a Rule 12 Motion.........................................18

VI.  PLAINTIFF'S MMWA CLAIMS ARE NOT PREEMPTED BY THE
     FDCA'S GENERAL REGULATION OF FOOD LABELING ......................20

VII. PLAINTIFF STATES UCL CLAIMS ............................................................22

     A.   The Fraudulent Prong.............................................................................22

     B.   The Unlawful Prong ................................................................................23

     C.   The Unfair Prong.....................................................................................25

CONCLUSION ..............................................................................................................25

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Aho v. Americredit Fin. Servs.*,
4
    277 F.R.D. 609 (S.D. Cal. 2011) ...................................................................24

5

*Allen v. Hylands, Inc.*,
6
    --- F.R.D. ---, 2014 WL 3819713 (C.D. Cal. Aug. 1, 2014).................13, 17, 18

7

*Allen v. Hylands, Inc.*,
8
    2012 WL 1656750 (C.D. Cal. May 2, 2012) ...................................................15

9

*AngioScore, Inc. v. TriReme Med., LLC*,
10
    2014 WL 4438082 (N.D. Cal. Sept. 9, 2014) .................................................25

11

*Ashcroft v. Iqbal*,
12
    556 U.S. 662 (2009)..........................................................................................1

13

*Bates v. Gen. Nutrition Ctrs., Inc.*,
14
    897 F. Supp. 2d 1000 (C.D. Cal. 2012) .....................................................21, 22

15

*Beaver v. Tarsadia Hotels*,
16
    --- F. Supp. 2d ---, 2014 WL 3002297 (S.D. Cal. July 2, 2014)....................25

17

*Bell Atl. Corp. v. Twombly*,
18
    550 U.S. 544 (2007)..........................................................................................1

19

*Brown v. Hain Celestial Grp., Inc.*,
20
    913 F. Supp. 2d 881 (N.D. Cal. 2012) .........................................................7, 19

21

*Bruno v. Eckhart Corp.*,
22
    280 F.R.D. 540 (C.D. Cal. 2012) ...................................................................17

23

*Bruton v. Gerber Prod. Co.*,
24
    2014 WL 172111 (N.D. Cal. Jan. 15, 2014).................................................17

25

*Bureerong v. Uvawas*,
26
    922 F. Supp. 1450 (C.D. Cal. 1996).............................................................23

27

28

*Castrol, Inc. v. Quaker State Corp.*,
   977 F.2d 57 (2d Cir. 1992)...........................................................................8

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ......................................................................24, 25

*Chabner v. United of Omaha Life Ins. Co.*,
   225 F.3d 1042 (9th Cir. 2000) ...............................................................23

*Chacanaca v. Quaker Oats Co.*,
   752 F. Supp. 2d 1111 (N.D. Cal. 2010) ................................................13

*Consumer Justice Ctr. v. Olympian Labs, Inc.*,
   99 Cal. App. 4th 1056 (2002) ................................................................21

*Czuchaj v. Conair Corp.*,
   2014 WL 1664235 (S.D. Cal. Apr. 18, 2014)...................................17, 19

*Diehl v. Starbucks Corp.*,
   2014 WL 295468 (S.D. Cal. Jan. 27, 2014)..........................................25

*Doe v. Abbott Labs.*,
   2004 WL 3639688 (N.D. Cal. Oct. 21, 2004) .......................................23

*Drum v. San Fernando Valley Bar Ass'n*,
   182 Cal. App. 4th 247 (2010) ................................................................25

*Forcellati v. Hyland's, Inc.*,
   2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ........................................17

*Forcellati v. Hyland's, Inc.*,
   876 F. Supp. 2d 1155 (C.D. Cal. 2012) ...........................................19, 22

*Gianino v. Alcer Corp.*,
   846 F. Supp. 2d 1096 (C.D. Cal. 2012) ................................................18

*Hairston v. S. Beach Beverage Co.*,
   2012 WL 1893818 (C.D. Cal. May 18, 2012) ......................................21

*Hansen Bev. Co. v. Vital Pharm., Inc.*,
   2010 WL 1734960 (S.D. Cal. Apr. 27, 2010).........................................8

iv

*In re Clorox Consumer Litig.*,
  894 F. Supp. 2d 1224 (N.D. Cal. 2012) ....................................................18

*In re Ford Tailgate Litig.*,
  2014 WL 3899545 (N.D. Cal. Aug. 8, 2014) ............................................14

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) .............................................................................24

*In re Warfarin Sodium Antitrust Litig.*,
  1998 WL 883469 (D. Del. Dec. 7, 1998) ...................................................2

*Jarrett v. Panasonic Corp. of N. Am.*,
  2013 WL 8148643 (E.D. Ark. June 21, 2013)..........................................20

*Kanter v. Warner-Lambert Co.*,
  99 Cal. App. 4th 780 (2002) ................................................................20, 21

*Keilholtz v. Lennox Hearth Prods. Inc.*,
  268 F.R.D. 330 (N.D. Cal. 2010)..............................................................16

*Kelley v. Corr. Corp. of Am.*,
  750 F. Supp. 2d 1132 (E.D. Cal. 2010) .......................................................7

*Kirkeby v. JP Morgan Chase Bank, N.A.*,
  2014 WL 4364836 (S.D. Cal. Sept. 3, 2014) ............................................25

*Klaxon v. Stentor Elec. Manuf. Co.*,
  313 U.S. 487 (1941)...................................................................................16

*Kwikset Corp. v. Super. Ct.*,
  51 Cal. 4th 310 (2011) ..............................................................................24

*Kyung Hwang v. Ohso Clean, Inc.*,
  2013 WL 1632697 (N.D. Cal. Apr. 16, 2013)...........................................17

*Lewis v. Robinson Ford Sales, Inc.*,
  156 Cal. App. 4th 359 (2007) ...................................................................24

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ....................................................................25

v

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

*Marsh v. First Bank of Del.*,
   2014 WL 2085199 (N.D. Cal. May 19, 2014) .......................................................16, 17, 18

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ........................................................................................16

*McKell v. Wash. Mut., Inc.*,
   142 Cal. App. 4th 1457 (2006) .....................................................................................25

*Morris v. BMW of N. Am., LLC*,
   2007 WL 3342612 (N.D. Cal. Nov. 7, 2007) ...............................................................24

*Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms.*,
   107 Cal. App. 4th 1336 (2003) .................................................................................8, 12

*Olivera v. Am. Home Mortg. Servicing, Inc.*,
   689 F. Supp. 2d 1218 (N.D. Cal. 2010) ........................................................................25

*Pecover v. Elec. Arts Inc.*,
   2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ..............................................................17

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ................................................................................................17, 18

*Rezner v. Bayerishe Hypo-Und Vereinsbank AG*,
   2011 WL 6329854 (N.D. Cal. Nov. 8, 2011) ...............................................................23

*Rogers v. Dow Agrosciences, LLC*,
   2006 WL 3147393 (W.D. Va. Oct. 31, 2006) ..............................................................22

*Sanders v. Apple Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) ...........................................................................7

*Saunders v. Super. Ct.*,
   27 Cal. App. 4th 832 (1994) .........................................................................................23

*Saval v BL Ltd.*,
   710 F.2d 1027 (4th Cir. 1983) ......................................................................................22

*Seifi v. Mercedes-Benz USA, LLC*,
   2013 WL 5568449 (N.D. Cal. Oct. 9, 2013) ................................................................14

vi

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ..................................................................8, 12

*Southwest Marine, Inc. v. Triple a Machine Shop, Inc.*,
   720 F. Supp. 805 (N.D. Cal. 1989) ................................................................24

*State Farm Fire & Cas. Co. v. Super. Ct.*,
   45 Cal. App. 4th 1093 (1996) ........................................................................24

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ......................................................................24

*Stewart v. Smart Balance, Inc.*,
   2012 WL 4168584 (D.N.J. June 26, 2012) ..................................................21

*ThermoLife Intern., LLC v. Gaspari Nutrition, Inc.*,
   2014 WL 99017 (D. Ari. Jan. 10, 2014) ........................................................1

*Tucci v. Club Mediterranee, S.A.*,
   89 Cal. App. 4th 180 (2001) ..........................................................................16

*Tyler v. Alltel Corp.*,
   265 F.R.D. 415 (E.D. Ark. 2010)....................................................................20

*Vasic v. Patent Health, LLC*,
   2014 WL 940323 (S.D. Cal. Mar. 10, 2014) .................................................25

*Viggiano v. Hansen Natural Corp.*,
   2013 WL 2005430 (C.D. Cal. May 13, 2013) ................................................21

*VP Racing Fuels, Inc. v. General Petroleum Corp.*,
   673 F. Supp. 2d 1073 (E.D. Cal. 2009) .........................................................23

*Walker v. Dreyer's Grand Ice Cream*,
   2006 WL 2642535 (N.D. Cal. Sept. 14, 2006) ..............................................23

*Wash. Mut. Bank v. Super. Ct.*,
   24 Cal. 4th 906 (2001) ..................................................................................16

*Whittlestone, Inc. v. Handi–Craft Co.*,
   618 F.3d 970 (9th Cir. 2010) ...................................................................7, 19

vii

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ...................................................................16, 18

**Statutes**

15 U.S.C. § 2310(d)(3)(A) ...........................................................................22

15 U.S.C. § 2311(d) .................................................................................20, 22

15 U.S.C. §§ 2301 *et seq.* ..............................................................................6

21 U.S.C. § 379r(a) ......................................................................................21

Ark. Code Ann. § 4–88–113(f) .....................................................................18

Ark. Code Ann. §§ 4-88-101 *et seq.* ...........................................................6

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ...................................................6

Cal. Bus. & Prof. Code §§ 17500 *et seq.* ...................................................6

Cal. Civ. Code § 1782(a) .............................................................................14

Cal. Civ. Code §§ 1750 *et seq.* ....................................................................7

Cal. Com. Code § 2313 ..................................................................................7

Cal. Com. Code § 2315 ..................................................................................7

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................7

Fed. R. Civ. P. 12(f) ......................................................................................7

**Regulations**

21 C.F.R. § 101.62 .......................................................................................21

21 C.F.R. § 320.24 .......................................................................................11

viii

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

1

## <u>INTRODUCTION</u>

2

Given not only the facts alleged in the First Amended Complaint, but also the attached

3

trial-ready *evidence*, there is every reason to believe Wal-Mart is selling defective Equate

4

CoQ10 supplements, likely resulting from the careless manufacturing or handling of a finicky

5

substance, highly susceptible to such problems. This in turn renders Wal-Mart's efficacy,

6

benefit, and comparative claims for Equate misleading to reasonable consumers unlikely to

7

see much, if any benefit from using Equate.

8

But while plaintiff believes her evidence is compelling, for this motion she only need

9

show that her allegations, accepted as true and viewed in the most favorable light, raise a

10

plausible claim to relief by allowing the Court to draw the inference that Wal-Mart is liable

11

for false advertising and the other violations alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

12

(2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

13

To this end, the significance of the USP testing and standards in this case is not a

14

function of whether they are mandatory—that is a red herring, just like Wal-Mart's argument

15

that information about Equate's rupture and dissolution reveals nothing about its absorption.

16

Under the Federal Food, Drug, and Cosmetic Act, USP standards are mandatory for drugs

17

but not dietary supplements because of the different way in which the FDA regulates those

18

substances in the first place. Drugs are potentially dangerous and thus highly-regulated, while

19

dietary supplements—which by definition cannot affect the structure or function of the body,

20

nor have therapeutic use to treat disease—are supposed to be innocuous, are presumed safe,

21

and are thus only lightly regulated. *See*, *e.g.*, *ThermoLife Intern., LLC v. Gaspari Nutrition,

22

Inc.*, 2014 WL 99017, at *15 (D. Ariz. Jan. 10, 2014) ("[T]he FDCA authorizes the FDA to

23

declare that a dietary supplement is 'adulterated' if it meets certain criteria," but the FDA

24

bears the burden of proof," whereas "[i]n contrast, the FDCA requires the manufacturer of a

25

drug or device to bear the burden of proving that the drug or device is safe before it may be

26

marketed.").

27

28

1

As the requirement that drugs meet USP standards suggests, those standards are significant because they are *scientifically valid*, and therefore reveal important *facts* about a tested substance.[1] It is these facts, gleaned from USP testing, on which plaintiff relies.

In the case of CoQ10, USP says to be effective, a water-soluble CoQ10 softgel like Equate must rupture in 15 minutes and dissolve at least 75%. Although the two do not necessarily go hand-in-hand because rupture depends on how the outer gelatin shell is manufactured and handled, while dissolution depends on the qualities and characteristics of the "medicine" contained therein (in the case of Equate, a mixture of CoQ10 and a delivery agent called VESIsorb), Equate regularly fails both tests. The most recent testing, which plaintiff commissioned after the Court invited a more concrete comparison of Equate to Qunol, showed Equate failing to rupture even after 60 minutes, and then dissolving only 2%.

Whether or not USP standard are mandatory, this testing suggests as a matter of *fact*, that when a consumer swallows an Equate pill, it will pass through her digestive tract intact (no rupture in an hour!), providing no benefit; and if she gets lucky and it maybe ruptures, the Equate pill will provide negligible absorption, for which dissolution is prerequisite.

By contrast, in apples-to-apples testing, Wal-Mart's own chosen comparator, Qunol, ruptures in 13 minutes and dissolves 92.7%. Other than to paraphrase plaintiff's allegations on pages 3, 4, and 11 of its dismissal motion, Wal-Mart does not say a single thing about Qunol. No distinguishment, no denial, no answer, no motion. But what could Wal-Mart say? Not only is it plausible the comparison is misleading, there is concrete proof of the fraud attached to the Complaint.

The Court should sustain the false advertising and other claims in First Amended Complaint (FAC, Dkt. No. 29), deny Wal-Mart's motions to dismiss and strike, and permit the action to proceed.

---

[1] *Accord In re Warfarin Sodium Antitrust Litig.*, 1998 WL 883469, at *3 (D. Del. Dec. 7, 1998) ("The USP publishes the official compendia of pharmaceuticals in the United States, and listing in the USP is essential to the acceptance of a pharmaceutical product by the medical community."), *rev'd on other grounds*, 215 F.3d 395 (3d Cir. 2000).

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FACTS**

To realize the benefits of a nutrient, it must first be absorbed into the body's systemic circulation in an adequate amount, after which it is carried to various organs and tissues for eventual uptake by the body's cells. The propensity of a substance to reach the systemic circulation is referred to as "bioavailability," which decreases with incomplete absorption. (FAC ¶ 13 & n.1.)

Because the body and digestive tract are aqueous, the rate of absorption of a nutrient, and thus its bioavailability, depends on its rate of dissolution. (*See id.* ¶¶ 1, 4, 13, 17, 25, 67.) Moreover, when a nutrient is ingested encapsulated in a softgel, dissolution cannot begin until the gelatin capsule ruptures, releasing its contents into the stomach to be dissolved then absorbed. (*See id.* ¶¶ 3-4, 23-24.) Thus, information about the time a softgel supplement takes to rupture, and its dissolution rate, provides an accurate idea of how effective the supplement is likely to be—that is, how bioavailable it will be—when orally ingested. (*Id.* ¶ 25.)

It is possible to test and accurately determine the rupture and dissolution of a nutrient offered in the form of a softgel, and thus to test its bioavailability indirectly. The United States Pharmacopeal Convention (USP) is a nonprofit scientific organization whose participants, working under strict conflict-of-interest rules, and using careful scientific method and consensus, set testing standards for drugs and dietary supplements. (*Id.* ¶¶ 3, 19.) Although compliance with USP standards is not required for dietary supplements, USP nevertheless plays a major role in the multi-billion dollar industry, providing the objective (and only) scientifically-valid industry standards against which all supplements may be tested and measured, providing important information about a supplement's intrinsic qualities, and serving as a "level playing field" for comparing two or more products. (*Id.* ¶ 20.)

USP promulgates these standards in an annual compendia known as USP-NF. Compliance with its USP monograph[2] means a tested product contains the ingredients listed

---

[2] USP monographs include the name of an ingredient or preparation; its definition; its packaging, storage, and labeling requirements; and its specification, which consists of a series of tests, procedures for the tests, and acceptance criteria. (*Id.* ¶ 26.)

3

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

in the declared amount and potency, and will break down and release into the body within a specified amount of time. Thus, whether or not required by regulation, the testing and measurement of a dietary supplement by the prescribed USP methodologies and standards provides an objective idea of whether the supplement is likely to be effective. (*Id.* ¶ 21.)

Coenzyme Q10 (CoQ10) is a vitamin-like, anti-oxidant nutrient produced naturally in the heart, liver, kidneys, and pancreas. CoQ10 has proven health benefits, but also a well-known drawback: it is not soluble in water, and poorly soluble in fat. To address this problem, some dietary supplement manufacturers have invented technologies for modifying orally-administered CoQ10 to increase its solubility. (*Id.* at ¶¶ 1, 11, 17.)

Wal-Mart sells a store-brand CoQ10 supplement called Equate High Absorption Co-Q10. Equate's packaging says it "Helps support Heart Health, "Supports heart and vascular health," "Promotes healthy blood pressure levels," is "Essential for energy production," is "Beneficial to Statin Drug Users," and provides "Powerful natural antioxidants." It also says Equate offers "clinical strength," "high absorption," and "3 times better absorption." And Wal-Mart represents that Equate is comparable to a competing brand-name CoQ10 supplement, by inviting consumers to "Compare to Qunol Ultra CoQ-10," by placing Equate immediately next to Qunol on Wal-Mart's retail shelves, and by modeling Equate's numerical claim, "3 times better absorption," on Qunol's identical claim. (*See id.* ¶¶ 2, 41-42, 76 & Exs. 1 & 7.)

Wal-Mart purchases Equate from a Rhode Island supplier, Lang Pharma Nutrition. Lang supplies identical CoQ10 softgels to at least one other retailer, CVS/pharmacy, which sells the CoQ10 softgels under its store brand, calling them "CVS/pharmacy Ultra CoQ-10."[3] The Lang-supplied softgels employ a patented vitamin delivery technology called VESIsorb. (*Id.* ¶¶ 31-33.) Like other CoQ10 delivery technologies, VESIsorb purports to increase the solubility of CoQ10 in water. (*See id.* ¶¶ 37-38, 40, 43, 66-68.)

---

[3] Ultra is the subject of a separate lawsuit pending in the Central District of California, styled *Harris v. CVS Pharmacy, Inc.*, No. 13-cv-2329-AB (AGRx) (C.D. Cal., filed Dec. 18, 2013). *See generally* Dkt. No. 20 (notice of supplemental authority attaching decision in *Harris*).

In an effort to prove the technology, VESIsorb's inventor, a Swiss company called Vesifact AG (*id.* ¶ 34), commissioned a study to compare the bioavailability of VESIsorb CoQ10 capsules with other commercially available CoQ10 supplements (*id.* ¶ 39). The results of the study were reported in the March-April issue of Alternative Therapies in Health & Medicine, in an article titled *Relative Bioavailability Comparison of Different Coenzyme Q10 Formulations with a Novel Delivery System.* (*Id.* ¶ 36 & Ex. 6.) Wal-Mart bases Equate's efficacy claims (*i.e.*, "high absorption," "3 times better absorption," and "clinical strength") on the study reported in *Relative Bioavailability.* (*Id.* ¶¶ 58, 74.)

USP has promulgated a monograph for CoQ10, which includes specific requirements and tolerances for water-soluble forms like Equate. (*See id.* ¶¶ 27-30 & Ex. 2.) To satisfy the monograph, water-soluble CoQ10 softgels, like the Lang-supplied VESIsorb CoQ10 softgels, must rupture within 15 minutes and achieve 75% dissolution. (*Id.* ¶¶ 28-29 & Ex. 3.)

Plaintiff has been using CoQ10 supplements since 2008. (*Id.* ¶ 45.) She purchased Equate on several occasions before mid-July 2013, relying on Wal-Mart's representations that it provides "clinical strength," "high absorption," and "3 times better absorption" than competing products, that it is comparable to more expensive brands like Qunol, and that it generally supports heart health. (*Id.* ¶¶ 46-48, 83.) Before purchasing Equate, plaintiff had previously purchased, and was familiar with Qunol, and believed it was a good and effective product. Because of the comparison, plaintiff thought Equate appeared to provide a better value, since it was a few dollars cheaper than Qunol. (*Id.* ¶ 47.)

Testing of the Lang-supplied VESIsorb CoQ10 softgels on five separate occasions between August 2013 and July 2014, commissioned both by plaintiff and Lang, shows the Equate softgels do not timely rupture, and the CoQ10 inside them does not adequately dissolve. (*See generally id.* ¶¶ 49-55 & Exs. 8-12.) Specifically:

- Covance Laboratories testing in August 2013 showed the Lang-supplied VESIsorb CoQ10 softgels achieved an average 41.24% dissolution across 12 samples (*id.* ¶ 54 & Ex. 12);

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

- Advanced Botanical testing in September 2013 showed 39% dissolution (*id.* ¶ 53 & Ex. 11);

- Tampa Bay Analytical testing in November 2013 showed an average 27.75% dissolution across 12 samples, with 10 capsules failing to rupture after 60 minutes, and 2 showing pinhole ruptures after 50 minutes (*id.* ¶ 52 & Ex. 10);

- Advanced Botanical testing in February 2014 showed Equate failed to rupture after 30 minutes (*id.* ¶ 51 & Ex. 9); and

- Eurofins testing in July 2014 showed Equate failed to rupture after 60 minutes, and achieved less than 2% dissolution (*id.* ¶ 50 & Ex. 8).

By contrast, Eurofins testing performed on a Qunol sample purchased on the same day, from the same Wal-Mart as the tested Equate sample, showed Qunol rupturing after 13 minutes, and achieving 92.7% dissolution. (*Id.*)

Based on these and related facts, plaintiff alleges that Equate is defective (*id.* ¶¶ 56-57); that Wal-Mart's efficacy claims of "high absorption," "3 times better absorption," and "clinical strength" are false and misleading (*id.* ¶¶ 58-74); that Wal-Mart's benefit claims—even if literally true—are deceptive (*id.* ¶¶ 75); and that Wal-Mart's comparison of Equate to Qunol is false and misleading (*id.* ¶ 76). Further, because Wal-Mart adds 10 IU of Vitamin E to Equate for purposes of supplementation, and makes a claim about the vitamin by identifying it in Equate's ingredient list as "d-alpha Tocopherol" (*id.* ¶ 78.), plaintiff alleges that Equate is misbranded under the Federal Food, Drug, and Cosmetic Act, and its state-law equivalent, the California Sherman Food, Drug, and Cosmetic Law (*id.* ¶¶ 77-82).

For these business practices, plaintiff brings causes of action on behalf of a putative nationwide class under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.* (FAC ¶¶ 99-109), and Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101 *et seq.* (FAC ¶¶ 110-114), as well as for breach of express and implied warranties (FAC ¶¶ 135-150); and on behalf of a putative California subclass under the fraudulent, unfair, and unlawful prongs of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* (FAC ¶¶ 115-124), the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, and

6

the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* (FAC ¶¶ 130-134), as well as for breach of express and implied warranties under Cal. Com. Code §§ 2313 & 2315 (FAC ¶¶ 151-172).

## REGARDING WAL-MART'S MOTION TO STRIKE[4]

A motion under "Rule 12(f) is confined by its own terms to the removal from a complaint of claims that are '(1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous.'" *Kelley v. Corr. Corp. of Am.*, 750 F. Supp. 2d 1132, 1146 (E.D. Cal. 2010) (quoting Fed. R. Civ. P. 12(f); *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 973-74 (9th Cir. 2010)). "Motions to strike are regarded with disfavor, as they are often used as delaying tactics, and should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 888 (N.D. Cal. 2012) (internal quotations and citations omitted). A Rule 12(f) motion should not be treated as a Rule 12(b)(6) motion, since striking claims under Rule 12(f) because they are precluded as a matter of law would add redundancy to other Rules, and provide for the application of a different standard of review on appeal. *See id.*; *Whittlestone*, 618 F.3d at 974. In addition, "[b]efore a motion to strike is granted, the court must be convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed." *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009).

## ARGUMENT

### I.   PLAINTIFF'S FRAUD-BASED CLAIMS SATISFY RULE 9(B)

####    A.   Wal-Mart Does Not Challenge Plaintiff's Allegation that Its Comparison to Qunol is False and Misleading

The Court held that while Wal-Mart's advertising "invites comparison between Equate CoQ-10 and Qunol Ultra CoQ-10," plaintiff's original complaint "provide[d] no concrete

---

[4] Wal-Mart submits motions to dismiss and strike under Rules 12(b)(6) and 12(f). Plaintiff responds to both motions herein, citing Wal-Mart's dismissal motion as "Mot.," and its motion to strike as "MTS."

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

comparison between products," and that "[i]f there is some relationship between Qunol Ultra CoQ-10 and the USP standards, it [was] not presented," MTD Order at 8. As the Court invited, plaintiff now presents both the relationship of Qunol to the applicable USP standards (Qunol passes both relevant tests), and a concrete comparison between Qunol and Equate. (*See* FAC ¶¶ 5, 50 & Ex. 8.) Wal-Mart's motion does not even address its comparative claim to Qunol, and thus it silence concedes that plaintiff states a claim for these allegations.

### B.   Plaintiff Adequately Alleges Wal-Mart's Efficacy and Benefit Claims are False or Misleading

When a manufacturer makes an establishment claim, it is representing that some testing establishes some characteristic about the product. More general claims are called non-establishment claims. In either case, a plaintiff must affirmatively prove falsity, rather than merely allege that the claim is unsubstantiated, but the proper methods for doing so varies as follows: the falsity of non-establishment claims "may be established by *testing*, scientific literature, or anecdotal evidence," *Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms.*, 107 Cal. App. 4th 1336, 1348 (2003) (emphasis added), while a plaintiff can prove the falsity of establishment claims by attacking the validity of defendant's testing, showing that the testing is contradicted or unsupported by other scientific tests, or showing that testing, even if reliable, does not establish the proposition asserted," *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citing, *inter alia*, *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62-63 (2d Cir. 1992) (distinguishing product superiority claim not based on testing, which must be proven false by affirmative evidence, from product superiority claim explicitly or implicitly based on tests or studies, which may be proven false by showing that the tests did not establish the proposition for which they were cited)); *see also Hansen Bev. Co. v. Vital Pharm., Inc.*, 2010 WL 1734960, at *4 (S.D. Cal. Apr. 27, 2010).

### 1.   *Plaintiff Adequately Pleads that Equate Does Not Meet Consumer Expectations Caused by its Labeling*

Plaintiff challenges three categories of Wal-Mart statements: benefit claims (like, "Helps support Heart Health"), efficacy claims (like "3 times better absorption"), and its

8

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

comparison to Qunol. (FAC ¶ 41.) Relying on a comment in the Court's dismissal Order, Wal-Mart first argues that plaintiff fails to allege "the degree of benefit she and reasonable consumers expected to receive based on the alleged misrepresentations and facts sufficient to make it plausible that the expected benefit was not provided." Mot. at 11 (citing MTD Order at 8-9).[5] Contrary to Wal-Mart's assertion, plaintiff pleads many facts permitting the inference that consumers were duped because Equate did not live up to the expectations created by Wal-Mart's labeling claims.

Plaintiff alleges that CoQ10 supplements have been available for 20 years, and that CoQ10 is a commodity product, with hundreds of different brands on the market. (FAC ¶¶ 14-15.) Thus, "[l]ike plaintiff, consumers of CoQ10 supplements—who are familiar both with CoQ10's benefits, and its poor absorption—seek out technologies that purport to increase its absorbability." (*Id.* ¶ 15.) Consumers' interest in enhanced absorption is reflected in a December 2009 statement by the National Advertising Division,[6] that "several manufacturers currently advertise 'absorbability' as one of the features of their CoQ10 supplements." (*Id.*) Even *Relative Bioavailability*, incorporated into the First Amended Complaint, notes that "[i]n the past several years, extensive efforts have been made to improve the oral bioavailability of CoQ10." (FAC Ex. 6 at 1.)

In addition, testing results now provide a concrete comparison of Equate to Qunol. (FAC ¶ 50 & Ex. 8). The Court should have no trouble finding it plausible that reasonable consumers would not expect supposedly comparable products to demonstrate, on the one hand less than 2% dissolution (Equate), and on the other, 92.7% dissolution (Qunol), or that

---

[5] Although Wal-Mart asserts that [t]he Court found that Plaintiff's *fraud allegations* failed," Mot. at 11 (emphasis added), this overstates the holding, which was directed at a single allegation in a single paragraph of the original complaint, concerning only the *benefit claims*. *See* MTD Order at 8-9 (addressing Compl. ¶ 40).

[6] The NAD is a division of the Council of Better Business Bureaus, whose policy and procedures are established by the Advertising Self-Regulatory Council (ASRC). NAD's mission is to review national advertising for truthfulness and accuracy, and thereby foster public confidence in the credibility of advertising. (FAC ¶ 70 n.5.)

9

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

reasonable consumers would find comparable a softgel supplement that never ruptures, even after an hour (Equate), and one that does so in 13 minutes (Qunol).

This comparison further supports plaintiff's challenges to the Equate efficacy claims, because one of the ways in which plaintiff sufficiently pleads that Equate does not live up to those promises is to contrast its performance with the verified performance of Qunol, which also claims "3x better absorption." (FAC ¶ 70; *see also id.* ¶¶ 2, 76 & Ex. 7.) This includes allegations that the NAD investigated Qunol's claims and found them justified based in part on its passing the USP dissolution test. (*Id.* ¶¶ 70 n.6, 76.)

As to "clinical strength," plaintiff alleges, based on an NAD ruling, that "[w]hen a product is touted as providing 'clinical' results or strength, consumers believe that means the product has been shown, in a clinical trial, to be effective." (*Id.* ¶ 72.) But plaintiff alleges a variety of reasons why the sole clinical trial supposedly establishing Wal-Mart's efficacy claims, *Relative Bioavailability*, does not actually do so. (*Id.* ¶¶ 58-71.)

Finally, as to the benefit claims, plaintiff alleges that "CoQ10 *can* offer such benefits if supplements are carefully formulated, manufactured, and handled," but that "defects in Equate's formulation, manufacturing, or distribution chain resulting in CoQ10 softgels with frequent rupture failures and suboptimal dissolution, render the statements as used on Equate misleading, especially in combination with other efficacy and comparative claims." (*Id.* ¶ 75.) The inference that Equate suffers from such defects flows logically from the testing results. (*Compare* FAC ¶ 57 ("The wide divergence in Equate's dissolution results—less than 2%, 28%, 39%, 41%, 45%—suggest some defect in its formulation, manufacturing (including possibly relating to its outer softgel gelatin coating), packaging, or distribution resulting in inconsistent batches of Equate CoQ10, many of which provide the consumer little or no effect, and which may degrade quickly during the product's shelf life.").)

Wal-Mart demands plaintiff plead some sort of bright line that somehow purports to measure consumer expectations resulting from these benefit claims. At this stage, however, that is neither possible nor required. Instead, plaintiff need only plead adequate facts to show it is plausible that Wal-Mart's benefit claims were likely to deceive the public. While it may

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

be difficult at this stage, for example, to plead a precise amount of dissolution a consumer expects, it is at least plausible, and in reality almost self-evident, that Equate, advertised as providing "high" and "3 times better" absorption, but in some cases dissolving less than 2%—especially when compared to the 75% required under scientifically-valid USP standards, and the 92.7% achieved by its invited comparator—falls well short of consumer expectations.

Wal-Mart's invitation to consumers to compare Equate to Qunol itself logically demonstrates something about consumers' expectations. In order for that advertising to be compelling, Qunol must be known to a relatively large segment of potential Equate purchasers, and believed to have some positive attribute such that Wal-Mart's comparison would cast a positive light on Equate. Thus, plaintiff's allegations also suggest consumers would expect similar benefits to those offered by Qunol. Plaintiff alleges Equate does not offer those benefits because of its rupture problems and poor dissolution, issues that do not plague Qunol.

### 2. *Plaintiff's Allegations of Equate's Rupture and Dissolution Failures Support Her False Advertising Claims*

Wal-Mart assertion that plaintiff "mistakenly uses the USP rupture test as a substitute for determining the amount of CoQ10 in the blood," Mot. at 12, is bizarre: if a softgel's outer capsule never ruptures, there will be *no* CoQ10 in the blood, because the CoQ10 inside the capsule will never enter the digestive system. (*See* FAC ¶ 3 (without rupture, Equate "will pass through a consumer's digestive tract without *any* dissolution or absorption").) And even if, as Wal-Mart contends, there may be direct methods of testing bioavailability, Mot. at 12 (citing 21 C.F.R. § 320.24), plaintiff's indirect testing still shows it is plausible that Equate's absorption claims are misleading.

Wal-Mart's argument that plaintiff's allegations concerning *Relative Bioavailability* contradict her false advertising claims, Mot. at 12-13, ignores the First Amended Complaint's many paragraphs describing the study's problems including with sample size, improper exclusion criteria, the authors' admission of only limited initial results with no verification of

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

clinical response, and bias (FAC ¶¶ 60-62), such that "*Relative Bioavalability* does not establish Wal-Mart's claims" (*Id.* ¶ 58). But, as plaintiff alleges:

> even if *Relative Bioavailability* supported the conclusion that the VESIsorb capsules tested in Germany in 2008—likely fresh samples, carefully-manufactured by someone other than Swiss Caps, provided directly to the study's administrators by Vesifact— exhibited increased absorption, this does not support *Wal-Mart's* claim that *Equate*, as formulated, mass-manufactured, and distributed in the United States and available on retail shelves to consumers, offers equivalent "high" or "3 times" absorption.

(*Id.* ¶ 63.)

### 3.    *Plaintiff Alleges Equate's Advertising Claims are Affirmatively False*

Plaintiff does not, as Wal-Mart contends, merely allege "that [*Relative Bioavailability*] is inadequate to substantiate the statements on" Equate. Mot. at 13. Rather, as set forth in *Southland Sod*, plaintiff alleges that the testing supposedly establishing Equate's efficacy claims is invalid (FAC ¶¶ 59-62), or alternatively does not establish the proposition asserted (*id.* ¶ 63). And though not even necessary to state a claim for affirmative falsity, these allegations are further supported and bolstered by allegations of additional testing that demonstrates falsity, which under *Nat'l Council Against Health Fraud* can even demonstrate the falsity of non-establishment claims.

## II.    PLAINTIFF ALLEGES INJURY SUFFICIENT FOR STANDING

Wal-Mart argues plaintiff lacks standing because she "fails to plead facts sufficient to establish a causal connection between the product claims on the label she challenges and the alleged injury," since she supposedly "fails to assert that she ever used or attempted to use" Equate. Mot. at 7. This is wrong.

The First Amended Complaint alleges that plaintiff "has used CoQ10 supplements since 2008" and "[o]n several occasions, . . . purchased Equate," in substantial part based on Equate's comparison to Qunol since, "[b]efore ever purchasing Equate, plaintiff was familiar with, and had previously purchased Qunol," and "believed it was a good and effective product[.]" (FAC ¶¶ 45-47.) Although the Complaint could have been more express about plaintiff's actual, physical use of Equate, there is sufficient connection between the allegation

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in paragraph 45 that plaintiff "used CoQ10," with the details of her Equate purchases in paragraphs 46-48, that it is a reasonable inference flowing from the pleading.[7]

But it does not matter anyway, because plaintiff need not allege she *used* Equate to show she was injured by *purchasing* it, so long as she purchased it in reliance on a misrepresentation. *See* MTD Order at 7 & n.3 (rejecting Wal-Mart's previous standing challenge). In *Allen v. Hylands, Inc.*, --- F.R.D. ---, 2014 WL 3819713 (C.D. Cal. Aug. 1, 2014) ["*Allen II*"], for example, in certifying a nationwide class action against a manufacturer of homeopathic supplements, the court noted it had rejected a similar argument and held that "Plaintiffs need only show *economic* injury resulting from Defendants' allegedly false or misleading advertising. Allegations that Plaintiffs purchased Defendants' products to obtain certain advertised health benefits but that the products failed to deliver these benefits would certainly suffice to show injury." *Id.*, at *2; *accord Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1125 (N.D. Cal. 2010) (rejecting argument that plaintiffs lacked standing because they failed to allege harm from use, since "[t]he injury here is the *purchase* of food products that contain an ingredient the plaintiffs find objectionable"). The question of use is irrelevant: if a product like a homeopathic remedy cannot possibly work, as Allen alleged, then anyone who paid money in reliance on efficacy claims lost money and has standing, whether or not they ever used the pills. The injury, as here, occurs at the moment of purchase.

Alternatively, Wal-Mart argues plaintiff "fails to allege that she bought the product for the purpose of receiving the benefit set forth on the label, and subsequently that the product did not actually provide the benefit." Mot. at 7. To the contrary, plaintiff alleges she "relied on Wal-Mart's representation that Equate provides 'clinical strength,' 'high absorption,' and '3 times better absorption' than competing products, that it is comparable to more expensive brands like Qunol, and that it generally supports heart health." (FAC ¶¶ 48, 83.) She also alleges that "[b]ecause it frequently fails even to rupture, Equate is actually ineffective, so

---

[7] Wal-Mart did not complain about this aspect of her pleading last time, which she otherwise would easily have addressed in the First Amended Complaint.

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

plaintiff did not receive what she paid for," and "[e]ven where Equate ruptures, because it fails to adequately dissolve, Equate is actually only partially effective" (*id.* ¶ 84). These allegations summarize the far more detailed allegations throughout the First Amended Complaint about the validity and significance of the rupture and dissolution testing, and its relationship to Wal-Mart's advertising claims.

## III.   PLAINTIFF GAVE PROPER CLRA NOTICE

Plaintiff provided CLRA notice on August 23, 2013. (FAC ¶ 134 & Ex. 13.) Although she filed her lawsuit on September 3, she did not then seek damages. (Compl., Dkt. No. 1 at ¶ 97; *see also id.* ¶ 94 (seeking injunctive relief only); *compare* FAC ¶ 133.) The first time plaintiff sought CLRA damages was when she filed the First Amended Complaint on July 28, 2014. Thus, plaintiff complied with the notice requirement of Cal. Civ. Code § 1782(a). *See Seifi v. Mercedes-Benz USA, LLC*, 2013 WL 5568449, at *6 (N.D. Cal. Oct. 9, 2013) (plaintiffs "did not improperly seek money damages prior to serving . . . CLRA demand letter" where complaint "warned that if [defendant] failed to heed the demand letter, 'Plaintiffs shall amend this Complaint . . . to include compensatory and money damages . . . .'" (record citation omitted)).

Wal-Mart's argument is erroneous because it ignores plaintiff's disclaimer of damages in her original Complaint, and misrepresents § 1782(a) as applying to *any* CLRA claim, although that provision really only requires notice "prior to the commencement of an action *for damages*," Cal. Civ. Code § 1782(a) (emphasis added), and "section 1782(d) expressly provides that an action for injunctive relief may be brought without pre-suit notice," *In re Ford Tailgate Litig.*, 2014 WL 3899545, at *5 (N.D. Cal. Aug. 8, 2014).[8]

---

[8] Plaintiffs previously explained this in detail; given the plain language of the statute and clear precedent applying it, Wal-Mart's argument is borderline frivolous. *See* Opp. to Mot. to Dismiss Compl., Dkt. No. 17 at 25.

## IV. PLAINTIFF STATES BREACH OF WARRANTY CLAIMS BASED ON EQUATE'S FAILURE TO MEET ITS LABEL PROMISES, RATHER THAN ITS FAILURE TO SATISFY USP REQUIREMENTS

The Court previously held that "Plaintiff must allege facts establishing a minimum standard for supplements" to plausibly state various warranty claims. MTD Order at 10. The First Amended Complaint satisfies this requirement by alleging that if a softgel capsule does not timely rupture, its inner contents will not enter the digestive system, providing no absorption, and that testing shows Equate frequently fails to rupture, sometimes after as much as an hour. A softgel that does not rupture is no different than a sugar pill, and is not what Equate purchasers paid for. Minimally, a softgel must rupture to satisfy promises that it provides any efficacy or benefit.

Analogous warranty claims were upheld in *Allen v. Hylands, Inc.*, 2012 WL 1656750 (C.D. Cal. May 2, 2012), an action alleging that homeopathic supplements "contain no active ingredients in sufficient quantities that could deliver those benefits" advertised. *See id.*, at *3. As the court explained in upholding express and implied warranty claims:

> Plaintiffs allege that Defendants' products will not work at *any* time for *anyone* because they either lack ingredients that will produce the advertised relief or contain the ingredients in insufficient quantities to be effective. If this is true— as the Court must assume on a motion to dismiss—then Defendants' statements about relief and effectiveness are not.

*Id.*, at *4.

Wal-Mart is wrong that plaintiff's express warranty claims are based on Equate's failure to comply with USP standards. Mot. at 9; MTS at 4. Instead, plaintiff alleges for her warranty causes of action that Equate does not provide "clinical strength," "high absorption," or "3 times better absorption," as promised and advertised on the label. (FAC ¶¶ 136, 153). The allegation that Equate does not timely rupture, and may dissolve less than 2%, supported by several testing results—but not at all dependent on USP standards themselves—renders these claims plausible. (FAC ¶¶ 141-142, 146-147.) For example, whether or not Equate satisfies USP's 75% dissolution requirement, it is plausible that Equate does not provide

15

1
2
3
4

"clinical strength," "high absorption," and "3 times better absorption," if it dissolves less than 2%, because 2% is almost nothing, and without dissolution, there can be no absorption or benefit. Moreover, no matter how effective the substance inside, a softgel can provide no benefit if it does not timely rupture to release those contents into the digestive tract.

5
6
7
8
9
10

## V.   BECAUSE ITS POSSIBLE THAT ARKANSAS LAW MAY APPLY TO THE CLAIMS OF A NATIONWIDE CLASS SINCE DOING SO WOULD COMPORT WITH DUE PROCESS, BUT A COMPREHENSIVE CHOICE-OF-LAW ANALYSIS IS NOT YET POSSIBLE ON THE FACTS OF THIS CASE, THE COURT SHOULD RESERVE THIS ISSUE FOR CLASS CERTIFICATION

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001), *amended* 273 F.3d 1266 (9th Cir. 2001)); *see also Klaxon v. Stentor Elec. Manuf. Co.*, 313 U.S. 487 (1941). "Generally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event that party must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." *Wash. Mut. Bank v. Super. Ct.*, 24 Cal. 4th 906, 919 (2001) (citation and internal punctuations omitted); *see also Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 341 (N.D. Cal. 2010) (same) (quoting *Tucci v. Club Mediterranee, S.A.*, 89 Cal. App. 4th 180, 188-89 (2001)). A court should apply California's three-step governmental interest test to make this determination. . . . *This analysis must be performed separately with respect to each state and each claim*. *Marsh v. First Bank of Del.*, 2014 WL 2085199, at *4 (N.D. Cal. May 19, 2014) (emphasis added) (citing *Wash. Mut. Bank*, 24 Cal. 4th at 919; *Zinser*, 253 F.3d at 1188).

26
27
28

Here, plaintiff has "timely invoke[d] the law of a foreign state," *Wash. Mut.*, 24 Cal. 4th at 919: Arkansas. (Compl., ¶¶ 71-75.) The Court previously dismissed plaintiff's Arkansas claims without prejudice, noting that "[w]ithout a separately-noticed motion on

16

choice of law, the Court" was only "preliminarily assum[ing] that the laws in question are conflicting and that both California and Arkansas have legitimate state interests." MTD Order at 6 n.2. As the Court's discussion suggests, "[s]uch an inquiry is most appropriate at the class certification stage of the case, after the parties have engaged in discovery." *Kyung Hwang v. Ohso Clean, Inc.*, 2013 WL 1632697, at *21 (N.D. Cal. Apr. 16, 2013); *see also Czuchaj v. Conair Corp.*, 2014 WL 1664235, at *9 (S.D. Cal. Apr. 18, 2014); *Bruton v. Gerber Prod. Co.*, 2014 WL 172111, at *13 (N.D. Cal. Jan. 15, 2014).

Wal-Mart argues that ADTPA claims are "not viable in a putative class action in California." MTS at 3. This is incorrect: there is no *per se* bar; plaintiff just has to make the proper showing, at the appropriate time, following the correct analysis. *See generally Marsh*, 2014 WL 2085199, at *4-7 (applying choice of law principles to class action brought in California where plaintiff sought to invoke Texas law on behalf of a nationwide class); *Allen II*, 2014 WL 3819713, at *7 ("if . . . all consumer class actions must be adjudicated under the laws of the different states as a matter of law, nationwide consumer class actions would become unmanageable and impossible to certify, and such an outcome would be contrary to the express purpose of CAFA to 'assure fair and prompt recoveries for class members with legitimate claims'"); *compare Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *4 (C.D. Cal. Apr. 9, 2014) (certifying nationwide class); *Bruno v. Eckhart Corp.*, 280 F.R.D. 540 (C.D. Cal. 2012) (denying motion to decertify nationwide class in wake of *Mazza*).

### A.   Applying Arkansas Law to a Nationwide Class Comports with Due Process

To invoke Arkansas law on behalf of a nationwide class, before moving to the governmental interest test, plaintiff must initially demonstrate that doing so comports with due process. *See Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, at *17 (N.D. Cal. Dec. 21, 2010) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985)). To do this, plaintiff need only show Arkansas has a "'significant contact or significant aggregation of contacts' to the claims" asserted, such that "application of the forum law is 'not arbitrary or unfair.'" *Id.* (quoting *Shutts*, 472 U.S. at 821-22).

17

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

Application of Arkansas law to the claims of a nationwide class is not arbitrary or unfair here, and comports with due process. First, the ADTPA provides that "*[a]ny* person who suffers actual damage or injury as a result of an offense or violation as defined in this chapter has a cause of action," Ark. Code Ann. § 4–88–113(f) (emphasis added), and thus by its plain language is not limited to Arkansas residents. It was thus also foreseeable to Wal-Mart that any consumer from any state might sue under the ADTPA.

Second, Wal-Mart's contacts with Arkansas constitute "significant contact or significant aggregation of contacts' to the claims" asserted, *see Shutts*, 472 U.S. at 814, because "courts consider 'where the defendant does business, whether the defendant's principal offices are located in [the state], where class members are located, and the location from which advertising and other promotional literature decisions were made." *In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237-38 (N.D. Cal. 2012) (quotation omitted). Wal-Mart maintains its headquarters and has its principal place of business in Arkansas, the state from which the challenged advertising emanated. (FAC ¶ 10; *see also id.* Ex. 1 (Equate packaging noting "Distributed by: Wal-Mart Stores, Inc., Bentonville AR 72716").) A California district court recently applied California law to a nationwide class against a California company on similar factual grounds. *Allen II*, 2014 WL 3819713, at *6-7. Thus, certification of a nationwide class against Wal-Mart, applying Arkansas law, is plausible as a matter of due process.

**B.      Plaintiff Should Not Be Required to Make a Full Choice-of-Law Analysis in Opposing a Rule 12 Motion**

"Because [plaintiff] seeks to invoke the law of a jurisdiction other than California, she bears the burden of proof." *Zinser*, 253 F.3d at 1187. But this is a substantial task, even after showing due process is satisfied: "Where the plaintiff 'allege[s] that consumers from [all] states were defrauded into buying [ ] a product in their state[,] . . . all 50 states have an interest in having their own laws applied to the consumer transactions that took place within their borders.'" *Marsh*, 2014 WL 2085199, at *6 (alterations in original) (quoting *Gianino v. Alcer Corp.*, 846 F. Supp. 2d 1096, 1102 (C.D. Cal. 2012)). Plaintiff can only satisfy her burden

18

"by engaging in an analytically rigorous discussion of each prong of California's 'governmental interests' test based on the facts and circumstances of *this* case and *this* Plaintiff's allegations." *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1161 (C.D. Cal. 2012). Because plaintiff must offer a state-by-state, analytically rigorous discussion specific to the as-of-yet-undeveloped facts of this case, it is unfair to ask that she do so now, at the pleading stage, in a single opposition brief, prior to any discovery.

By disputing the application of Arkansas law to the class, Wal-Mart surreptitiously seeks a Rule 23 ruling concerning the First Amended Complaint's nationwide class allegations. But motions to strike are not properly used for asking the court to preclude a claim as a matter of law. *Whittlestone, Inc.*, 618 F.3d at 974; *Brown*, 913 F. Supp. 2d at 888. The Court should not indulge Wal-Mart, especially given the dearth of its briefing, just 22 lines in its dismissal motion, Mot. at 9-10, and a couple pages in its motion to strike, MTS at 3-5. *See Czuchaj*, 2014 WL 1664235, at *9 ("Conair offers a single page of analysis of the choice of law issue in its motion to dismiss" and "briefly notes differences in the statues of limitations and the definition of a 'defect.' Additional, general discussion . . . was briefly included in the Motion to Strike. After evaluating the briefing, the Court determines that it has insufficient briefing to engage in a careful analysis of the differences between the various bodies of law or the interests of the different states" and "therefore does not have the necessary facts and briefing it requires to make a proper determination at this time.").

Instead, the Court should, respectfully, reserve judgment on the viability of applying Arkansas law to a nationwide class, so that plaintiff has a full, fair opportunity to make the proper showing (including discovering facts about the connection of behavior in Arkansas to transactions throughout the United States), when seeking certification of a nationwide class. Wal-Mart's motion to strike readily admits that "[o]f course, whether a case is suitable for class treatment is most often addressed at the class certification stage." Mot. at 10; MTS at 3. And Wal-Mart's authority also supports this, with both *Jarrett v. Panasonic Corp. of N. Am.*,

19

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

1  2013 WL 8148643, at *8 (E.D. Ark. June 21, 2013), and *Tyler v. Alltel Corp.*, 265 F.R.D.
2  415, 418-419, 421 (E.D. Ark. 2010),[9] decided during class certification, not on the pleadings.

3  **VI.  PLAINTIFF'S MMWA CLAIMS ARE NOT PREEMPTED BY THE FDCA'S**
4  **GENERAL REGULATION OF FOOD LABELING**

5  Wal-Mart contends an MMWA claim "cannot stand if another federal statutory scheme
6  governs *the written warranties* pertaining to" Equate, but then argues inappositely that
7  because "there is a statutory scheme governing the *labeling* of [Equate], Plaintiff's
8  Magnuson-Moss Act claim must be dismissed." Mot. at 14 (emphases added). The latter is in
9  incorrect statement of the law. While the MMWA is "inapplicable to any written warranty
10 the making or content of which is otherwise governed by federal law," the statute also
11 provides that, "[i]f only a portion of a written warranty is so governed by Federal law, the
12 remaining portion shall be subject to this chapter." 15 U.S.C. § 2311(d).[10] Thus, Wal-Mart's
13 interpretation is contracted by the statute itself.

14 Section 2311(d) is inapplicable to the written warranties plaintiff challenges—"clinical
15 strength," "high absorption," and "3 times better absorption" (FAC ¶¶ 136, 153)—because
16 those warranties are not "governed by federal law," even if dietary supplement labeling in
17 general is governed by the FDCA. The cases on which Wal-Mart relies are not contrary.

18 In *Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780 (2002), plaintiffs brought
19 MMWA claims against the manufacturers of over-the-counter head lice treatments. *Id.* at 784.
20 The court found the MMWA claims preempted because plaintiffs challenged statements that
21 the FDA had explicitly approved and required in reviewing the new drug applications
22 submitted for these products. *See id.* at 796. Thus, plaintiffs warranty claims, challenging the

23
24  [9] Moreover, *Tyler* did not concern the ADTPA, but instead contracts for phone service in
25  which consumers agreed all disputes would be governed by the law of the state of their billing
26  addresses. 265 F.R.D. at 423-424. And both *Tyler* and *Jarrett* applied Arkansas, not
    California, choice-of-law principles, *id.* at 425; *Jarrett*, 2013 WL 8148643, at *10.

27  [10] Because § 2311(d) refers only to "written warranties," on its face it does not apply to
28  plaintiff's MMWA claims predicated on state law violations of implied warranties.

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

exact language that the FDA approved, if sustained, "would result in the establishment of a state requirement regarding labeling that would be 'different from' and 'otherwise not identical with' the federally required label . . . , and each is therefore preempted." *Id.* (citing 21 U.S.C. § 379r(a)). *Kanter* is thus distinguishable on two grounds. First, the labeling of over-the-counter drugs is subject to an express preemption clause, § 379r(a), whereas given the purpose and history of Dietary Supplement Health and Education Act, "it would be more accurate to say the Act evidences, far from implied preemption, an instance of implied *non*-preemption." *Consumer Justice Ctr. v. Olympian Labs, Inc.*, 99 Cal. App. 4th 1056, 1063 (2002). Second, the labeling for over-the-counter lice treatments was subject to a monograph that required or expressly permitted the defendant to make the very labeling statements plaintiffs were challenging, whereas nothing in the FDCA or DSHEA requires Wal-Mart to call Equate "high absorption," "3 times better absorption," or "clinical strength."

And *Hairston v. S. Beach Beverage Co.*, 2012 WL 1893818 (C.D. Cal. May 18, 2012), did not, as Wal-Mart contends, broadly hold that the MMWA never applies to products subject to FDCA regulations. Instead, it narrowly held that certain phrases the defendant used relating to "all natural" were governed by FDCA rules for natural flavoring in foods, and that calling a good "natural" was a "product description" as opposed to a promise of being "defect-free or guarantee[] of specific performance levels," which is what the MMWA covers. *Id.*, at *6.[11] Thus, like in *Kanter*, it was because the court found the challenged statements themselves expressly regulated, that it found the MMWA claim preempted.

Relying on *Kanter* and *Hairston*, the court in *Bates v. Gen. Nutrition Ctrs., Inc.*, 897 F. Supp. 2d 1000 (C.D. Cal. 2012), considered a challenge to a claim that a dietary supplement

---

[11] *Compare Viggiano v. Hansen Natural Corp.*, 2013 WL 2005430, at *13 (C.D. Cal. May 13, 2013) ("the FDCA, and the regulations promulgated thereunder, govern food labeling requirements generally, and the use of 'all natural flavors' specifically"); *Stewart v. Smart Balance, Inc.*, 2012 WL 4168584, at *14 (D.N.J. June 26, 2012) ("[t]o the extent that 'fat free' is the equivalent of 'defect free,' despite the fact that compliant milk may contain no less than 0.5 grams of fat, the making or content of the claim is governed by" 21 C.F.R. § 101.62,).

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

misleadingly said it contained DMAA as a component of geranium. *Id.* at 1002. Without appreciating the nuance of the *Kanter* and *Hairston* decisions, the court noted that "[o]ther courts have . . . dismissed such claims relating to the labeling of products that the [FDCA] regulates," and found that since the action "deals with the labeling of Defendants' C-4 Extreme dietary supplement," plaintiffs MMWA claims were preempted. It is not apparent from the decision whether defendants' claim that the product contained DMAA as a component of geranium was expressly regulated by the FDCA, but assuming the statement was *not* regulated, *Bates* overstates the holdings in *Kanter* and *Hairston*, reading 15 U.S.C. § 2311(d) more broadly than its plain language allows. *See also Forcellati*, 876 F. Supp. 2d at 1164 (discussing erroneous reasoning in *Kanter*).

Further, unlike the defendants in these cases, Wal-Mart has not provided any "federal law" that governs the claims "clinical strength, "high absorption" and "3 times better absorption," nor could it. In any event, at the pleading stage, it is too early to determine the applicability of § 2311(d). *See Rogers*, 2006 WL 3147393, at *9-10 (noting that *Kanter* was decided on summary judgment, rather than at pleading stage).

Citing 15 U.S.C. § 2310(d)(3)(A), Wal-Mart alternatively argues that plaintiff does not allege individual damages over $25.00. However, plaintiff alleges she purchased Equate "on several occasions," and thus it is plausible she was damaged in this amount. In addition, by the statute's plain language, the costs and expenses of the lawsuit may be included in the $25 minimum. *See Saval v BL Ltd.*, 710 F.2d 1027, 1032 & n.7 (4th Cir. 1983). At this early stage, and construing the allegations in the most favorable light to plaintiff, the Court should decline to dismiss the claims under § 2310(d)(3)(A).

## VII.   PLAINTIFF STATES UCL CLAIMS

### A.     The Fraudulent Prong

For its assertion that plaintiff does not state a claim under the UCL's "fraudulent" prong, Wal-Mart just refers to its argument that she does not satisfy Rule 9(b). This is wrong for the reasons discussed in the introduction and Point I.B.

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

## B.     The Unlawful Prong

Plaintiff alleges violations of the UCL's unlawful prong based on predicate violations of the MMWA, FDCA, Lanham Act, ADTPA, FAL, CLRA, and Sherman Law. (FAC ¶ 122.)

Wal-Mart asserts that plaintiff cannot base a UCL unlawful prong on a violation of the Lanham Act because she would not, as a consumer rather than a competitor, have standing to assert a Lanham Act claim directly. Mot. at 15. It similarly argues plaintiff cannot state an unlawful prong claim based on the FDCA, since the statute contains no private cause of action. *Id.* at 16. These arguments are wrong because standing to state an unlawful prong claim depends only on satisfying the UCL's standing requirements, not on showing standing to assert a claim for the predicate violation directly: "section 17200 can form the basis for a private cause of action even if the predicate statute does not." *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (citation omitted). Thus, "California courts have consistently held that where a business act or practice violates any law, that violation is actionable under the UCL, regardless of whether the predicate law itself contains a private right of action." *Rezner v. Bayerishe Hypo-Und Vereinsbank AG*, 2011 WL 6329854, at *5 (N.D. Cal. Nov. 8, 2011) (citing *Saunders v. Super. Ct.*, 27 Cal. App. 4th 832, 838-39 (1994) (citations omitted)). In sum, "to state a claim under the unlawful prong of the UCL, a plaintiff need only allege conduct that 'can properly be called a business practice and is at the same time forbidden by law.'" *Id.* (quoting *Walker v. Dreyer's Grand Ice Cream*, 2006 WL 2642535, at *2 (N.D. Cal. Sept. 14, 2006)).

Accordingly, several courts have permitted UCL unlawful claims for violations of statutes under which, like the Lanham Act and FDCA, plaintiff has no standing to recover directly. *See VP Racing Fuels, Inc. v. General Petroleum Corp.*, 673 F. Supp. 2d 1073, 1079-82 (E.D. Cal. 2009) (permitting claim for violation of Petroleum Marketing Practices Act, which "does not provide for a private right of action"); *Doe v. Abbott Labs.*, 2004 WL 3639688 (N.D. Cal. Oct. 21, 2004) (denying motion to dismiss claim predicated on violation of Sherman Act), *rev'd on other grounds*, 571 F.3d 930 (9th Cir. 2009); *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1477 (C.D. Cal. 1996) (dismissing claims under Fair Labor

Standards Act because employee lacked standing, but refusing to dismiss UCL unlawful claim predicated on FLSA violations); *Southwest Marine, Inc. v. Triple a Machine Shop, Inc.*, 720 F. Supp. 805, 807 (N.D. Cal. 1989) (permitting claim for violations of Navy's hazardous waste regulations). As these decisions demonstrate, the question of standing under a statute like the Lanham Act is separate from the question of what behavior the statue prohibits, and thus what is actionable under the UCL. Moreover, the UCL's unlawful prong combines the substantive prohibitions of other laws, like the Lanham Act and FDCA, with its own broad consumer standing provision. Accordingly, because plaintiff pleads facts that establish Wal-Mart's wrongful conduct under the Lanham Act and FDCA, she states UCL "unlawful" claims for their violation.

Finally, in a footnote, Wal-Mart argues as to the misbranding allegations (FAC ¶¶ 77-82), that plaintiff lacks standing because she does not allege she relied on the absence of Vitamin E. Mot. at 16 n.2 This misstates the UCL's standing requirement for this type of unlawful prong claim.

"By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotations omitted) (citing *State Farm Fire & Cas. Co. v. Super. Ct.*, 45 Cal. App. 4th 1093, 1103 (1996) (citation omitted)). "Fraud is not an essential element of a UCL claim," *Morris v. BMW of N. Am., LLC*, 2007 WL 3342612, at *5 (N.D. Cal. Nov. 7, 2007) (citation omitted), and "the claim . . . that Defendant has engaged in unlawful conduct under the UCL, does not *require* reliance." *Aho v. Americredit Fin. Servs.*, 277 F.R.D. 609, 623 (S.D. Cal. 2011) (emphasis added) (citing *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (quotation omitted); *Lewis v. Robinson Ford Sales, Inc.*, 156 Cal. App. 4th 359, 371 (2007)); *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 325 n.17 (2009) ("There are doubtless many types of unfair business practices in which the concept of reliance, as discussed here, has no application.")); *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 327 n.9 (2011) (expressing "no views concerning the proper construction of the cause requirement"

1
2
3
4

in UCL actions not grounded in fraud). Instead, "[f]or claims based on the 'unfair' or 'unlawful' prong of the UCL . . . courts have held that the plaintiff need not allege reliance on misrepresentations, and may allege 'causation more generally.'" *Olivera v. Am. Home Mortg. Servicing, Inc.*, 689 F. Supp. 2d 1218, 1224 (N.D. Cal. 2010).

5

### C.    The Unfair Prong

6
7
8
9
10
11

Wal-Mart relies on *Cel-Tech* to assert that plaintiff must show an antitrust-like harm to state a claim, but *Cel-Tech* expressly limited its test to the competitor context. *AngioScore, Inc. v. TriReme Med., LLC*, 2014 WL 4438082, at *7 n.5 (N.D. Cal. Sept. 9, 2014) (citing *Cel-Tech Commc'ns*, 20 Cal. 4th at 187 n.12). In reality, "in the consumer context, there is a split of authority as to what test for unfairness applies." *Id.* (citing *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256 (2010) (recognizing split)).

12
13
14
15
16
17
18
19
20
21

Plaintiff's unfair prong claim sets forth three tests under which she alleges Wal-Mart's practices are unfair. (FAC ¶¶ 119-121.) Several recent decisions by other Southern District courts have favored these tests in the consumer context. *See Kirkeby v. JP Morgan Chase Bank, N.A.*, 2014 WL 4364836, at *4 (S.D. Cal. Sept. 3, 2014) (citing *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736-37 (9th Cir. 2007)); *Beaver v. Tarsadia Hotels*, --- F. Supp. 2d ---, 2014 WL 3002297, at *13-15 (S.D. Cal. July 2, 2014); *Vasic v. Patent Health, LLC*, 2014 WL 940323, at *4 (S.D. Cal. Mar. 10, 2014); *Diehl v. Starbucks Corp.*, 2014 WL 295468, at *10 (S.D. Cal. Jan. 27, 2014) (citing *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1474 (2006)). Wal-Mart does not dispute that plaintiff's allegations sufficiently state a claim for unfair business practices under these tests.

## **CONCLUSION**

22
23
24
25

The Court should deny in its entirety Wal-Mart's motion to dismiss and motion to strike; but if the Court dismisses the First Amended Complaint in part or in whole, plaintiff respectfully requests it be without prejudice and with leave to amend.

26
27
28

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT

Dated: September 15, 2014

Respectfully Submitted,

By: /s/ Jack Fitzgerald

JACK FITZGERALD
*jack@jackfitzgeraldlaw.com*
**THE LAW OFFICE OF
JACK FITZGERALD, PC**
The Palm Canyon Building
2870 Fourth Avenue, Suite 205
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

RONALD A. MARRON
*ron@consumersadvocates.com*
SKYE RESENDES
*skye@consumersadvocates.com*
ALEXIS M. WOOD
*alexis@consumersadvocates.com*
**LAW OFFICES OF RONALD
A. MARRON, APLC**
651 Arroyo Drive
San Diego, California 92103
Phone: (619) 696-9006
Fax: (619) 564-6665

***Counsel for Plaintiff and the
Proposed Classes***

*Cortina v. Wal-Mart Stores, Inc.*, No. 13-cv-2054-BAS-DHB
OPPOSITION TO WAL-MART'S MOTIONS TO DISMISS & STRIKE FIRST AMENDED COMPLAINT