David C. Allen (SBN 190479)
*david.allen@btlaw.com*
Kevin D. Rising (SBN 211663)
*kevin.rising@btlaw.com*
Sarah E. Johnston (SBN 259504)
*sarah.johnston@btlaw.com*
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone:   (310) 284-3880
Facsimile:    (310) 284-3894

Attorneys for Defendants
WAL-MART STORES, INC. and LANG
PHARMA NUTRITION, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAMAR SANTISTEBAN CORTINA, on behalf of herself, all others similarly situated and the general public,<br><br>Plaintiff,<br><br>v.<br><br>WAL-MART STORES, INC. and LANG PHARMA NUTRITION, INC.,<br><br>Defendants. | Case No.  13-cv-2054-BAS (DHB)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LANG PHARMA NUTRITION, INC.'S MOTION FOR SANCTIONS AGAINST PLAINTIFF'S ATTORNEYS (28 U.S.C. § 1927)**<br><br>**Date**:      Dec. 14, 2015<br><br>*Hon. Cynthia Bashant*<br><br><u>**Oral Argument Requested**</u><br><br>*[Filed concurrently with Notice of Motion; Declaration of David C. Allen; Declaration of Sarah E. Johnston; and (Proposed) Order]* |

/ / /

/ / /

/ / /

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Page(s)*

*Alvarado-Morales v Digital Equipment Corp.*, 842 F.2d 613 (1st Cir. 1988) ................................................................................16

*Avirgan v. Hull*, 932 F.2d 1572 (11th Cir. 1991) ........................... 16, 17, 18

*Blue v. U.S. Department of Army*, 914 F.2d 525 (4th Cir. 1990) ........... 14, 18

*Cortina v. Goya Foods, Inc.*, 3:14-cv-169 (S.D. Cal. Jan. 23, 2014)............20

*Cortina v. Novartis Consumer Health, Inc.*, 3:14-cv-69 (S.D. Cal. Jan. 10, 2014) ................................................................................19

*Cortina et al. v. Novartis Consumer Health, Inc.*, 3:14-cv-160 (N.D. Cal. Apr. 3, 2014) ................................................................20

*Cortina v. Pepsico, Inc.*, 3:14-cv-2023 (S.D. Cal. Jan. 23, 2014)................20

*Cortina v. Pepsico, Inc.*, 3:14-cv-02023 (N.D. Cal. May 2, 2014) ...............20

*Cortina v. Welch Foods, Inc.*, 1:12-cv-10070 (D. Mass. Jan. 11, 2012).......19

*Cotterill v. City and County of San Francisco*, 2010 U.S.Dist. LEXIS 28310 (N.D. Cal. Mar. 10, 2010) ................................................15

*Fusco v. Medeiros*, 965 F.Supp. 230 (D. R.I. 1996) ....................................16

*Gary Reynolds et al. v. Walgreen Co.*, Case No. 4:15-CV-00324-JSW (N.D. Cal. Jan. 23, 2015)..............................................................3

*Lahiri v. Universal Music and Video Distributing Corp.*, 606 F.3d 1216 (9th Cir. 2010) ................................................... 14, 15, 17

*Lee v. First Lenders Insurance Services, Inc.*, 236 F.3d 443 (8th Cir. 2001) ................................................................................ 20, 21

*Leo Harris v. CVS Pharmacy, Inc.*, Case No. ED-CV-13-2329-ABC-AGRx (C.D. Cal. Dec. 18, 2013) ................................................3

*Neft v. Vidmark, Inc.*, No. 91-56471, 1993 U.S.App. LEXIS 31109 (9th Cir. 1993) ................................................................................15

*Pratt v. State of California*, 11 Fed. App'x. 883 (9th Cir. 2001) .......... 15, 18

*Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d 644 (9th Cir. 1997) ................................................................................19

*Raymond Alvandi v. CVS Pharmacy, Inc. et al.*, Case No. 2:15-CV-01503-RGK-PLA (C.D. Cal. March 2, 2015)...........................................3

*Rodriguez v. Marble Care International, Inc.*, 863 F.Supp.2d 1168
(S.D. Fla. 2012) .............................................................................. 16, 19

*The Jolly Group, Ltd. v. Medline Indust., Inc.*, 435 F.3d 717 (7th Cir.
2006) ......................................................................................................16

*Toombs v. Leone*, 777 F.2d 465 (9th Cir. 1985).................................... 18, 19

*West Coast Theater Corp. v. City of Portland*, 897 F.2d 1519 (9th Cir.
1990) ....................................................................................................15

## FEDERAL STATUTES

28 U.S.C. § 1332(d)(2) .................................................................................3

28 U.S.C. § 1404(a) ...................................................................................20

28 U.S.C. § 1927........................................................ 2, 13, 16, 17, 18, 19, 21

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq* ..............................3

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

13cv2054

## I.  **INTRODUCTION**

For more than two years, "Plaintiff's Counsel"[1] have pursued a claim against Defendant Lang Pharma Nutrition, Inc. ("Lang") that is demonstrably and facially false.  Plaintiff's Counsel contend that the claims of absorption into the bloodstream made on the label of Equate CoQ10 are false and misleading; they have alleged Equate CoQ10 does not adequately absorb into the bloodstream. Plaintiff's Counsel based this allegation on Equate CoQ10's alleged failure to pass certain voluntary testing standards for dissolution and disintegration developed by the United States Pharmacopeial Convention ("USP").  However, the introductory statement on the USP standards relied on by Plaintiff's Counsel expressly states that USP dissolution and disintegration testing <u>cannot</u> be used as a surrogate for blood tests or absorption.  Furthermore, the operative complaint and Plaintiff's discovery responses make clear that Plaintiff's Counsel never actually conducted any blood tests or obtained blood tests conducted by others.  In other words, Plaintiff's Counsel have based two years of aggressive litigation on a claim regarding absorption into the bloodstream without ever actually testing absorption into the bloodstream of any human being.

Adding insult to injury is the fact that Plaintiff's Counsel filed three other nearly identical cases against Lang and other retailers who sell Lang's CoQ10 product under their respective store brands.  Thus, Lang has been forced to litigate the same meritless claims in multiple courts for more than two years now.  Now, just as Plaintiff's discovery responses are due and after Defendants noticed Plaintiff's deposition in advance of the October 28, 2015 deadline for discovery on

---

[1] This motion seeks sanctions against all of Plaintiff's Counsel, which is defined to include: (1) Jack Fitzgerald, The Law Offices of Jack Fitzgerald; (2) Ronald A. Marron, Law Offices of Ronald A. Marron; and (3) Thomas A. Canova, a non-California lawyer who also represents Ms. Cortina in this case, is affiliated with The Law Office of Jack Fitzgerald and made a special appearance at the mediation held by Magistrate Judge David H. Bartick.

class certification issues, Plaintiff's Counsel filed a one-paragraph "Motion to Voluntarily Dismiss" without prejudice, presumptively allowing them to refile the lawsuit elsewhere. Plaintiff's Counsel brazenly claim that no party will be prejudiced by this dismissal after two years. *See* Dkt. 71.

Sanctions under 28 U.S.C. section 1927 are warranted when <u>any</u> of the following occurs: (1) an attorney fails to make a reasonable investigation into his claims; (2) an attorney continues to pursue a claim after knowing it is meritless; (3) an attorney's conduct rises to the level of harassment; and (4) an attorney abandons his claims after extraordinary expense to the defendant. Explained in detail below, Plaintiff's Counsel have committed all of these misdeeds.

For the reasons set forth below, Lang respectfully requests that this Court award sanctions against Plaintiff's Counsel in the amount of at least $501,081.90, comprising the attorney fees and expenses incurred by Defendant in this litigation since April 23, 2015, the date Plaintiff's Counsel filed the Second Amended Complaint, which contained blatantly false allegations.[2]

Given the complexity of these issues and the fact that Plaintiff's Counsel now seeks voluntary dismissal of all claims, Lang requests oral argument on this Motion and Plaintiff's Motion to Dismiss, to take place on the same day. In accordance with this Court's Standing Order, Lang will file under separate cover an *ex parte* application to specially set a hearing.

## II. RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The following facts underlie the history of this litigation and related litigation, and demonstrate a pattern of reckless behavior by Plaintiff's Counsel to

---

[2] Alternatively, this brief also provides evidence that the sanctions should include attorney fees and expenses incurred from August 1, 2014, the date a reasonable inquiry would have revealed Plaintiff's Counsel's allegations about their USP tests were false.

1   unnecessarily and vexatiously multiply and prolong a claim that, had it been vetted

2   appropriately, never should have been filed.

3           **A. September 2013: Plaintiff's Counsel Initiates the *Cortina* Case**

4           The instant action concerns a Walmart store-brand dietary Coenzyme Q10

5   ("CoQ10") supplement, which is sourced and supplied by Lang and sold by

6   Walmart as "Equate High Absorption CoQ-10" ("Equate").  The *Cortina* case is

7   one of four nearly identical class action lawsuits brought by Plaintiff's Counsel

8   since 2013 against real party in interest Lang and the other retailers of CoQ10

9   sourced and supplied by Lang.  These cases are: (1) *Leo Harris v. CVS Pharmacy,*

10  *Inc.*, Case No. ED-CV-13-2329-ABC-AGRx (C.D. Cal. Dec. 18, 2013); (2) *Gary*

11  *Reynolds et al. v. Walgreen Co.*, Case No. 4:15-CV-00324-JSW (N.D. Cal. Jan. 23,

12  2015); and (3) *Raymond Alvandi v. CVS Pharmacy, Inc. et al.*, Case No. 2:15-CV-

13  01503-RGK-PLA (C.D. Cal. March 2, 2015).[3]

14          On September 2, 2013, Plaintiff's Counsel filed the *Cortina* action against

15  Walmart on behalf of a putative national class, alleging generally that the claims of

16  absorption into the bloodstream on the Equate label were false and misleading

17  because the product failed to meet voluntary standards developed by the United

18  States Pharmacopeial Convention ("USP").  *See* Compl., Dkt. 1.  What Plaintiff's

19  Counsel failed to disclose was the test method they asked the Court to rely upon

20  (and attached as an Exhibit 3 to the Complaint) was from an outdated USP

21  publication.

22

23  _____

24  [3] Lang and the other retailers successfully obtained dismissals for lack of subject
    matter jurisdiction in all three of the other cases, at various stages in discovery, on

25  the grounds that (1) sales of the subject product at the time of filing the complaint
    totaled less than the $5 million amount in controversy required under the Class

26  Action Fairness Act (28 U.S.C. § 1332(d)(2)); and (2) Plaintiff failed to name 100
    named plaintiffs as required under the Magnuson-Moss Warranty Act, 15 U.S.C. §

27  2301 *et seq.*  The dismissal orders for all three cases are attached to Johnston Decl.

28  ~~as Exhs. 1, 2, and 3.~~

1    Although Lang was not named as a defendant until later, Lang is and has

2    been the real party in interest in this case.  Pursuant to a manufacturing contract

3    with Walmart, Lang has indemnified Walmart in this action since the outset of this

4    case.

5         **B. October 2013: Walmart Moves to Dismiss**

6         On October 25, 2013, Walmart moved to dismiss the claim pursuant to

7    Federal Rule 12(b)(6).  Dkt. 15.  In its Motion to Dismiss, Walmart argued that

8    Plaintiff failed to adequately plead <u>any</u> cause of action against Walmart because her

9    claims were based solely on the alleged failure of Equate to satisfy the admittedly

10   <u>voluntary</u> USP test standards.  *See* Mtn., Dkt. 15, p. 3:28-4:8.  This Court agreed,

11   recognizing that that "Plaintiff cannot, as attempted in the Complaint, force

12   Defendant to comply with USP test standards or suggest that Defendant's

13   comparative claims somehow subject it to the [USP] CoQ10 Monograph."  Order,

14   Dkt. 26, 8:18-20.  Likewise, this Court found, "Plaintiff asserts Defendant's product

15   'does not provide the minimum amount of CoQ10 required and fails to adequately

16   dissolve' and is 'defective.'  Compl., ¶¶ 117, 100.  To meet the pleading standard,

17   Plaintiff must allege facts establishing a minimum standard for supplements.  Other

18   than <u>voluntary</u> USP standards, no minimum levels are established in the

19   Complaint."  *Id*. at 10:4-8 (emphasis added).

20        This Court granted Walmart's motion on June 23, 2014, permitting Plaintiff's

21   Counsel leave to amend.  Dkt. 26.

22        **C. July 2014: Plaintiff's Counsel File the First Amended Complaint[4]**

23        On July 28, 2014, Plaintiff's Counsel filed a First Amended Complaint

24   ("FAC").  Dkt. 29.  Because this Court had admonished Plaintiff's Counsel for their

25

26   [4] Explained in Section II.D, *infra*, the substantive allegations in the FAC and the
     now-operative Second Amended Complaint ("SAC") are nearly identical.  Thus, for
27   ease of reference in this section, all references to specific allegations in the FAC
     include citation to the corresponding paragraphs in the SAC.
28

attempt to hinge liability on Equate's failure to comply with voluntary USP standards, Plaintiff's Counsel tried a slightly different tack – affirmatively asserting that USP dissolution testing could be used as proof of a product's efficacy and absorption, and that failure under the USP was in fact proof of the Equate's inefficacy.

The claims in the FAC are generally summed up as follows:

- For the benefits of Lang's CoQ10 to be realized, it must reach "systemic circulation;" in other words, it must be absorbed into the bloodstream.[5]

- Absorption into the bloodstream is referred to as "bioavailability."[6]

- CoQ10 in its raw form has poor bioavailability, and thus, the formulation of CoQ10 supplements determines that specific CoQ10's ability to be absorbed into the bloodstream.[7]

- Lang's CoQ10, sold by Walmart as Equate, claims to offer increased absorption, and therefore, increased bioavailability, over some competing CoQ10 products.[8]

- The absorption/bioavailability claim on the Equate label was

---

[5] FAC, ¶ 13; SAC, ¶ 15 ("In order to provide a benefit, a nutrient must first be absorbed into the body's systemic circulation in an adequate amount. Thereafter, it is carried to various organs and tissues for eventual uptake by the cells. Accordingly, to realize any benefits of CoQ10 supplementation at a cellular level, an individual must achieve effective or optimum CoQ10 blood levels.")

[6] FAC, ¶ 13, fn. 1; SAC, ¶ 15, fn. 1 ("Bioavailability is the propensity of a substance to reach the systemic circulation . . . .").

[7] FAC, ¶ 13, SAC, ¶ 15 ("It has been reported that the bioavailability of raw CoQ10 powder is less than 10%."); FAC, ¶ 14, SAC, ¶ 16 ("The formulation of a CoQ10 dietary supplement is crucial to its bioavailability."); FAC, ¶ 16, SAC, ¶ 18 ("Over the past several years, dietary supplement manufacturers have taken a variety of approaches to boosting the bioavailability of orally-administered CoQ10 supplements . . . with varying degrees of success.")

[8] See FAC, ¶ 41; SAC, ¶ 44 (Equate's packaging makes the representation that it is "high absorption" and offers "3 times better absorption.")

substantiated by a published study comparing the bioavailability of CoQ10 capsules made with a technology called "VESIsorb," such as the Lang CoQ10, versus other commercially available CoQ10 supplements. The study is entitled *Relative Bioavailability Comparison of Different Coenzyme Q10 Formulations with a Novel Delivery System*, Z. Xia-Lui et al., Alternative Therapies in Health & Medicine, 15(2) 2009 (hereafter "*Relative Bioavailability*").[9]

- The *Relative Bioavailability* study specifically measured the levels of CoQ10 in the study participants' blood plasma.[10]

- An organization called the United States Pharmacopeial Convention ("USP") promulgates voluntary standards for vitamins and supplements and publishes these standards annually in a compendia called the USP-NF. Compliance with USP standards is not required by any regulation.[11]

It is important to note here that this allegation confirms that Plaintiff's Counsel knew that USP published its test methods "annually." [12] Yet the USP test attached to the FAC was several years old. *See* Declaration of David C. Allen at ¶ 8 and Exhibit 4 thereto. Continuing the summary of the FAC:

- The USP has published a series of tests for disintegration and dissolution of dietary supplements. This testing is published in the

_____

[9] *See* FAC, ¶ 39, SAC, ¶ 42, Exh. 6 to FAC and SAC.

[10] *See* Exh. 6 to FAC and SAC.

[11] FAC, ¶ 19, SAC, ¶ 21 ("USP is a nonprofit scientific organization [which develops] voluntary standards for the quality of vitamins and dietary supplements, in a compendia known as USP-NF."); FAC, ¶ 20, SAC, ¶ 22 ("[C]ompliance with USP's standards concerning dietary supplements is not required by regulation, [and] manufacturers are not required by law to meet them." FAC, ¶ 20, SAC, ¶ 22.)

[12] FAC at ¶ 19 ("known as Reference Standards, they are updated and published annually and jointly by USP and the National Formulary in a compendia known as USP-NF.")

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

USP-NF General Chapter on Disintegration and Dissolution of Dietary Supplements, USP-NF General Chapter <2040>.  Plaintiff claims that a true and correct copy of <USP 2040> is attached as Exhibit 3 to the FAC.[13]

- The USP tests for disintegration and dissolution are quality control tests, but do not test the level of absorption of a supplement into the bloodstream.[14]

- Plaintiff alleges that the absorption and bioavailability claims on the Equate label are false and misleading because various laboratories have conducted USP disintegration and dissolution testing on Lang's CoQ10, and several test results showed failure under the USP's protocols.[15]

---

[13] FAC, ¶ 29, SAC, ¶ 31 ("The tests for Disintegration (sometimes called Rupture) and Dissolution (sometimes called solubilization) are set forth in the USP-NF General Chapter on Disintegration and Dissolution of Dietary Supplements, USP-NF General Chapter <2040>, a true and correct copy of which is attached hereto as Exhibit 3, and expressly incorporated into this Complaint. Although Chapter <2040> includes sections on both Disintegration and Dissolution, the specific dissolution procedure set forth in the USP CoQ10 Monograph supplements or replaces the dissolution section in Chapter <2040>.  For Disintegration, Chapter <2040> requires 'Soft Shell Capsules,' like the VESIsorb CoQ10 softgels and Qunol softgels, to '[p]roceed as directed under Rupture Test for Soft Shell Capsules,' which in turn requires rupture 'in not more than 15 minutes.'")
[14] See Exh. 3 to FAC and SAC (setting forth laboratory testing for the disintegration and dissolution tests, which facially does not include blood testing).
[15] FAC, ¶ 49, SAC, ¶ 52 ("The Lang-supplied VESIsorb CoQ10 softgels that Walmart sells as Equate have been subject to numerous tests in 2013 and 2014, including by both plaintiff and Lang, sometimes on behalf of Walmart or CVS. Several tests show USP failures." ) (emphasis added).  Plaintiff goes on to list testing performed by various testing laboratories, all of which employed USP testing (see FAC, ¶¶ 49-55; SAC, ¶¶ 52-58): (1) July 2014 testing by Eurofins Scientific, in which testing was conducted according to "methods prescribed by USP"; (2) February 2014 testing by Advanced Botanical Consulting & Testing, Inc., in which USP "rupture" testing was conducted; (3) November 2013 testing by

1       •  Other than testing pursuant to USP protocols, Plaintiff cites to no

2         other testing conducted on the Equate CoQ10, including testing of

3         bioavailability/absorption into the bloodstream, that would contradict

4         the bioavailability claims on the Equate label as substantiated by the

5         *Relative Bioavailability* study.[16]

6        ***In sum***, Plaintiff's Counsel claims throughout the FAC that bioavailability is

7    the most important factor in determining efficacy of Lang's CoQ10, but that the

8    *Relative Bioavailability* study is proven false because certain laboratories ran USP

9    disintegration and dissolution testing on Lang's CoQ10, and certain lots of the Lang

10   CoQ10 did not pass those tests.  In other words, Plaintiff's Counsel alleges

11   throughout the FAC that <USP 2040> is a measure of the efficacy and

12   bioavailability (blood absorption) of Equate CoQ10, and is sufficient to refute the

13   findings in the clinical study reported in *Relative Bioavailability*.   These allegations

14   are false.

15       **D. March 2015: Lang's Counsel Discovers <USP 2040> Amendments**

16       In preparation for the Early Neutral Evaluation on April 3, 2015 before

17   Magistrate Judge David Bartick, Lang's counsel conducted internet research on

18   <USP 2040> to determine its applicability to the issues in this case. *See* Allen

19   Decl., ¶ 2. Specifically, Lang's counsel performed a very simple Google search for

20   information on "USP 2040." *See id.*, ¶ 3. The search revealed the identity of the

21   USP employee responsible for <USP 2040>. *Id.* at ¶ 3-4. An e-mail exchange with

22

23   Tampa Bay Analytical Research, Inc., in which testing was performed "following
    USP protocols for testing rupture and dissolution;" (4) September 2013 testing by

24   Advanced Botanical Consulting & Testing, Inc., in which testing was performed
    "[u]sing the standard USP procedure;" and (5) August 2013 testing by Covance

25   Laboratories, in which testing was performed "[f]ollowing USP procedures."

26   [16] *See* FAC, ¶ 55; SAC, ¶ 58, summarizing Plaintiff's testing results and explicitly
    demonstrating that all of the testing relied on by Plaintiff relates only to USP

27   disintegration and dissolution protocols, rather than bioavailability/blood plasma

28   testing.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1  this employee and USP's in-house counsel led to the revelation that Plaintiff's

2  Counsel had submitted an outdated and unofficial version of <USP 2040> to the

3  court. *Id.* at ¶¶ 5-8. In 2014, the version of <USP 2040> relied on by Plaintiff's

4  Counsel had been revised to include the following introductory language:

> ***Disintegration and dissolution tests*** as described in this chapter ***are quality control tools*** to assess performance characteristics of dietary supplement finished dosage forms.  These performance standards are intended to detect problems that may arise due to use or misuse, or changes in coatings, lubricants, disintegrants, and other components.  These performance tests are also intended to detect manufacturing process issues such as over-compression and over-drying that would affect the release characteristics of the final dosage forms. ***These tests are not intended to be used as a demonstration or as a surrogate for in vivo absorption, bioavailability, or effectiveness, unless an in vitro-in vivo correlation (IVIVC) has been established.***"

*See* Allen Decl. at ¶ 6 and Exhibits 2, 4 and 5 thereto. The last sentence quoted above is hereinafter referred to as "USP's Absorption Disclaimer."

Given the direct impact of this revision on the issues in dispute in this case, Lang's counsel produced a copy of the revised version of <USP 2040> with the USP Absorption Disclaimer to Plaintiff's Counsel at the Early Neutral Evaluation on April 3, 2015. Allen Decl., ¶ 11. Moreover, the USP Absorption Disclaimer was raised with Plaintiff's Counsel several times thereafter. Id.

Thus, although Plaintiff's Counsel claimed to attach a "true and correct copy of <USP 2040> as Exhibit 3 to the FAC at paragraphs 29, a reasonable inquiry search <u>prior to filing the FAC</u> would have revealed that Exhibit 3 was in fact an "outdated" and "unofficial" version of the chapter, and that the version then available from USP for public comment explicitly stated that (1) the chapter 2040 disintegration and dissolution tests relied on by Plaintiff's Counsel are to be used as

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1  quality control testing -- rather than bioavailability or efficacy testing, despite the

2  claims throughout the FAC; and (2) the 2040 disintegration and dissolution testing

3  methods are not to be used in place of testing for "in vivo absorption,

4  bioavailability, or effectiveness, unless an in vitro-in vivo correlation (IVIVC) has

5  been established." Allen Decl. ¶ 9,  In other words, not only are the USP

6  dissolution and rupture tests completely voluntary, they also are completely

7  irrelevant to how much Equate CoQ10 is absorbed into the human bloodstream.  A

8  reasonable inquiry prior to filing the FAC on July 28, 2014 could have revealed this

9  to Plaintiff's Counsel.

10         **E. April 2015: Plaintiff's Counsel Files the Second Amended**

11             **Complaint**

12         On April 23, 2015, nearly three weeks after learning of the amendments to

13  <USP 2040>, Plaintiff's Counsel filed the SAC, naming Lang as a defendant.  Dkt.

14  51.  In paragraph 32 of the SAC, Plaintiff's Counsel make a passing reference to

15  USP's Absorption Disclaimer in the 2014 <USP 2040>, which had become

16  "official" as of August 1, 2014.  Allen Decl, ¶ 9.  However, with the exception of

17  this brief reference, Plaintiff's Counsel made no other changes to the complaint.

18  Indeed, all of the allegations about the USP tests proving the lack of bioavailability

19  and absorption listed in the footnotes above *remained unchanged.*  Moreover,

20  Plaintiff's Counsel continued the ruse.  They allege in paragraph 31 of the SAC that

21  they attached a "true and correct copy" of <USP 2040> as Exhibit 3. But again they

22  attached the outdated version of <USP 2040>, which did not contain the USP's

23  Absorption Disclaimer.

24         Incredibly, Plaintiff's Counsel did not revise the SAC (1) to actually address

25  the flaws regarding inapplicability of the USP testing alleged in the previous two

26  complaints; (2) to aver that actual in vivo absorption, bioavailability, or efficacy

27  testing had been performed on Equate; and/or (3) to aver that an IVIVC on Equate

28

1   CoQ10 had been established, as required by the USP Absorption Disclaimer.  Thus,

2   as with the FAC, the <u>only</u> support for Plaintiff's criticism of the Equate absorption

3   claims in the SAC were USP disintegration and dissolution tests, which USP

4   expressly states are not intended for such measurements.  *See* FAC, ¶¶ 64-65; SAC

5   ¶¶ 67-68 (claiming that the *Relative Bioavailability* study does not support the label

6   claims, misleadingly citing to a "substantial body of testing based on USP

7   standards" as the only support for this criticism).[17]

8   **F. September 2015: Defendants' Propound Written Discovery**

9       On September 24, 2015, Defendants propounded multiple sets of written

10   discovery aimed at, among other things, obtaining the necessary scientific

11   foundation for Plaintiff's claims.  *See* Requests for Production of Documents,

12   Requests for Admissions, and Interrogatories to Plaintiff, attached as Exhs. 4, 5,

13   and 6 to Johnston Decl.  Plaintiff's responses were due on or before October 27,

14   2015.  *Id.*  Regarding blood absorption and bioavailability testing that would

15   provide a good faith basis for Plaintiff's claims, Defendants requested the

16   following:

17   - <u>Request for Production No. 30</u>: All DOCUMENTS reflecting any
       TESTING of blood or plasma for the purposes of determining in vivo
18       absorption or bioavailability of EQUATE (including without
19       limitation, the testing of YOUR blood or plasma or the blood or
         plasma of any putative class member).
20   - <u>Request for Production No. 31</u>: Samples of any blood or plasma
21       TESTED at the direction of YOU (or others acting on YOUR behalf)
         for the purposes of determining in vivo absorption or bioavailability of
22       EQUATE.
23   - <u>Request for Admission No. 2</u>: Admit that the USP Monograph for
24       Disintegration and Dissolution <USP 2040> attached as Exhibit 3 to

25   _____

26   [17] *See also* FAC, ¶ 55; SAC, ¶ 58, summarizing Plaintiff's testing results and
27   explicitly demonstrating that all of the testing relied on by Plaintiff relates only to
     USP disintegration and dissolution protocols, rather than bioavailability/blood
28   plasma testing.

the Second Amended Complaint is not the current version of USP 2040.

- <u>Request for Admission No. 3</u>: Admit that the 2014 USP Monograph for Disintegration and Dissolution <USP 2040> states that disintegration and dissolution tests are "not intended to be used as a demonstration or surrogate for in vivo absorption, bioavailability, or effectiveness, unless an in vitro in-vivo correlation (IVIVC) has been established."

- <u>Request for Admission No. 4</u>: Admit that YOU (or others acting on YOUR behalf) did not perform any TESTING of in vivo absorption or bioavailability of EQUATE before filing YOUR Complaint against Walmart.

- <u>Request for Admission No. 5</u>: Admit that YOU (or others acting on YOUR behalf) did not establish an in vitro-in vivo correlation (IVIVC) for EQUATE before filing YOUR Complaint against Walmart.

- <u>Request for Admission No. 7</u>: Admit that the USP TESTING YOU describe in the Second Amended Complaint is not recognized by the U.S. Food and Drug Administration as one of the four methods for measuring bioavailability of dietary supplements.

- <u>Request for Admission No. 9</u>: Admit that the USP TESTING YOU describe in the Second Amended Complaint does not measure the level of CoQ10 that is absorbed into the bloodstream.

- <u>Request for Admission No. 10</u>: Admit that YOU have no TEST results showing the amount of CoQ10 in your bloodstream after YOU ingested EQUATE.

- <u>Request for Admission No. 11</u>: Admit that YOU have no TEST results showing the amount of CoQ10 in the bloodstream of other individual(s) who ingested EQUATE.

- <u>Request for Admission No. 12</u>: Admit that YOU have no TEST results showing the amount of CoQ10 in the bloodstream of individual(s) who had ingested any CoQ10 product made by Lang Pharma.

- <u>Request for Admission No. 33</u>: Admit that YOU have no evidence of the level of CoQ10 in YOUR bloodstream after you ingested EQUATE.

- <u>Interrogatory No. 6</u>: If you contend that the "3x better absorption" statement on the EQUATE label is false, as alleged in paragraphs 4 and 5 of the Second Amended Complaint, state all facts in support of this contention. (For purposes of this interrogatory, "all facts" includes any TESTING in support of this contention, including the date(s) of TESTING, identification of the facilities or person(s) performing this TESTING, the TESTING protocols used, and the

BARNES &
THORNBURG, LLP
ATTORNEYS AT LAW
LOS ANGELES

reason(s) for which you believe such TESTING supports YOUR contention.)

These discovery requests go directly to the good faith basis for filing and prosecuting this class action. Nevertheless, on October 29, 2015 (two days <u>after</u> the responses were due) Plaintiff's Counsel served only objections to these requests, refusing to provide <u>any</u> substantive information.[18] See Exhs. 7, 8, and 9 to Johnston Decl.

### G. <u>October 2015: Plaintiff's Counsel Files A Bare Motion for Voluntary Dismissal</u>

On October 23, 2015, Cortina filed a one-paragraph Motion to Voluntarily Dismiss Without Prejudice, requesting that the case be dismissed, and that each side bear its own attorney's fees and costs because "defendants" will not suffer any "legal prejudice by dismissal." Dkt. 71. There is no statement as to why dismissal is sought. In other words, after more than two years of litigation, thousands of hours of attorney time and hundreds of thousands of dollars in fees and expenses borne by Lang, Plaintiff states, without any explanation, that the case should be dismissed without prejudice – presumably permitting Plaintiff's Counsel to restart the litigation in another court – and that Lang will not suffer any prejudice by its dismissal.

Defendants intend to file separately a conditional opposition to this motion, seeking dismissal with terms and conditions.

### III.   <u>LEGAL STANDARD FOR AWARDING SANCTIONS UNDER 28 U.S.C. § 1927</u>

Pursuant to 28 U.S.C. § 1927, "[a]ny attorney...who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court

---

[18] Plaintiff's Counsel also refused multiple requests to depose Ms. Cortina. To the extent that Plaintiff's pending Motion to Dismiss is denied, Lang intends to move to ~~compel further responses to all discovery.~~

1  to satisfy personally the excess costs, expenses, and attorneys' fees reasonably

2  incurred because of such conduct." The policy attendant to the award of sanctions

3  against attorneys pursuant to section 1927 is to promote efficient litigation and

4  deter meritless lawsuits. *See Blue v. U.S. Dept. of Army*, 914 F.2d 525, 533 (4th

5  Cir. 1990). In the Ninth Circuit, an award of sanctions under 28 U.S.C. § 1927

6  does not require a showing of subjective bad faith, only conduct that is objectively

7  reckless. *See Lahiri v. Universal Music and Video Distrib. Corp.*, 606 F. 3d 1216,

8  1219 (9th Cir. 2010) (distinguishing sanctions awarded pursuant to a district court's

9  inherent authority, which does require a bad faith finding).

10       Explained below, Plaintiff's Counsel's actions throughout this litigation

11  constitute clear reckless conduct, in that Plaintiff's Counsel (1) failed to conduct a

12  reasonable investigation before filing the Complaint or the FAC; (2) continued to

13  aggressively litigate this and related actions after learning Plaintiff's claims were

14  baseless; (3) engaged in discovery tactics constituting harassment; (4) misled the

15  Court by filing the SAC, knowing that Exhibit 3 to the SAC was an outdated

16  version of <USP 2040> that did not contain USP's Absorption Disclaimer; and (5)

17  now attempts to abandon this litigation after more than two years, freeing them to

18  re-file again elsewhere and continue to drive up costs for Lang.

19  **IV.   PLAINTIFF'S COUNSEL'S CONDUCT WARRANTS SANCTIONS**

20  **       UNDER 28 U.S.C. § 1927**

21       Based upon the recitation of facts above, Plaintiff's Counsel's conduct in this

22  litigation amounts to clear bad faith, and any one of his misdeeds <u>alone</u> warrants the

23  imposition of sanctions, as follows:

24       **A. <u>Plaintiff's Counsel Failed to Make Any Initial Inquiry Into His</u>**

25       **        <u>Claims</u>**

26       An award of sanctions is warranted when the plaintiff fails to make a cursory

27  investigation into the circumstances which would have revealed that there is no

28

1    basis for a claim. *See Lahiri v. Universal Music and Video Distrib. Corp.*, 606 F.

2    3d 1216, 1221 (9th Cir. 2010) (awarding sanctions where "had [plaintiff's counsel],

3    a self-described experienced copyright lawyer[19], made even a cursory investigation

4    into the circumstances of [plaintiff's claim for copyright infringement], he would

5    have known [plaintiff] had no copyright interest" over the piece of music in

6    dispute); *see also Pratt v. State of California*, 11 Fed. App'x. 883, 835 (9th Cir.

7    2001) (bad faith is present when an attorney "knowingly or recklessly" pursues a

8    "frivolous" or "baseless" claim without making a "reasonable and competent

9    inquiry" as to the basis of the claim) internal quotations omitted).

10        Indeed, the Ninth Circuit is replete with authority that filing a claim without

11    factual support and reasonable inquiry into that factual support constitutes more

12    than just reckless conduct, but conduct amounting to bad faith. *See West Coast*

13    *Theater Corp. v. City of Portland*, 897 F.2d 1519, 1528 (9th Cir. 1990) (affirming

14    district court's award of § 1927 sanctions because "the record indicates that

15    [plaintiff's] counsel recklessly proceeded with the litigation despite a complete lack

16    of factual support"); *see also Neft v. Vidmark, Inc.*, No. 91-56471, 1993 U.S. App.

17    LEXIS 31109, *10 (9th Cir. 1993) (affirming district court award of § 1927

18    sanctions because plaintiff's counsel "recklessly proceeded with the litigation

19    despite a complete lack of factual support for his claim.") (emphasis added); *see*

20    *also Cotterill v. City and County of San Francisco*, 2010 U.S. Dist. LEXIS 28310 at

21    *42-43 (N.D. Cal. Mar. 10, 2010) (awarding § 1927 sanctions because

22    "maintenance of this suit after November 5, 2008 was reckless as a matter of law,

23    and unreasonably and vexatiously multiplied the proceedings in violation of §

24    1927.").[20]

25

26    [19] Plaintiff's Counsel alleged in this case that they were "competent and experienced
27    in class action litigation." *See* FAC ¶ 94; SAC ¶ 99.
      [20] Decisions from other federal circuits consistently have found that failure to vet
28    ~~claims or reasonably investigate constitutes bad faith vexatious multiplication of~~

1    Section 1927 sanctions can be awarded in class actions where, as here, a

2    plaintiff's attorney fails to vet claims or to dismiss after the basis of the claim is

3    revealed to be incorrect. *See Alvarado-Morales v Digital Equipment Corp.*, 842

4    F.2d 613, 617 (1st Cir. 1988) (attorney's fees warranted under section 1927 in

5    putative class action, as counsel's "failure to properly investigate the facts prior to

6    filing suit and his failure to withdraw the complaint when the facts were revealed to

7    him by defendants' attorney during the early stages of discovery" had the effect of

8    belaboring meritless proceedings); *Fusco v. Medeiros*, 965 F. Supp. 230, 256 (D.

9    R.I. 1996) (sanctions warranted under section 1927 in part because of counsel's

10    decision to "dramatically inflate" a meritless claim by making class allegations

11    instead of pursuing a single claim).

12    In this case, it is clear that Plaintiff's Counsel wholly failed to investigate the

13    basis for the alleged false statements about absorption before filing the Complaint

14    in 2013. In the initial Complaint, Plaintiff's Counsel claimed that the Equate label

15    was false and misleading because it did not pass certain voluntary USP tests, but

16    failed to make any causal connection between the label claims and the voluntary

17

18    proceedings. *See Avirgan v. Hull*, 932 F.2d 1572, 1581 (11th Cir. 1991) (awarding

19    defendants attorney's fees and costs against plaintiffs' attorneys under section 1927

on the grounds that plaintiffs' meritless claim was the impetus for two years of

20    subsequent discovery); *The Jolly Group, Ltd. v. Medline Indust., Inc.*, 435 F.3d 717,

21    720 (7th Cir. 2006) (1927 sanctions are warranted when an attorney "pursue[s] a

claim that is without a plausible legal or factual basis and lacking in justification"

22    or "pursue[s] a path that a reasonably careful attorney would have known, after

23    appropriate inquiry, to be unsound . . . ."); *Rodriguez v. Marble Care Int'l, Inc.*, 863

F. Supp. 2d 1168, 1182 (S.D. Fla. 2012) (proceedings were unnecessarily

24    multiplied in Fair Labor Standards Act (FLSA) case, warranting section 1927

25    sanctions, where plaintiff's counsel "did not conduct a pre-suit inquiry to determine

[if an FLSA claim existed], filed their claim anyway, sought to take irrelevant

26    discovery in order to impose financial pressure on Defendants and **persisted in**

27    **prosecuting the claim** even though they never had the necessary evidence to

establish FLSA jurisdiction and **ignored** unrebutted evidence demonstrating that

28    [defendant] was not subject to the FLSA claim.") (emphasis in original).

1   testing protocols.  Relying on outdated versions of USP's test methods, the FAC

2   and SAC were intentionally revised to imply that USP's tests are proof of

3   absorption into the bloodstream and bioavailability.  However, the introduction

4   section of then current <USP 2040> chapter expressly stated that the Chapter 2040

5   disintegration and dissolution tests are <u>quality control</u> tests and <u>not</u> tests for

6   <u>bioavailability, absorption into the bloodstream, or efficacy</u>.  Moreover, Plaintiff's

7   Counsel concede in their pleadings that they knew that the USP published its test

8   methods <u>annually</u>, so using and attaching an outdated version of <USP 2040> as an

9   exhibit to the SAC is inexcusable and, in light of Plaintiff's Counsel's adherence to

10  the same allegations in the FAC, may have been deliberate.  At a minimum, it was

11  reckless.  *See* FAC, ¶ 19; SAC, ¶ 21.

12      Thus, had Plaintiff's Counsel, self-described experts in consumer class

13  actions, made even a cursory examination of the intended purposes of USP test

14  methods they asserted as evidence of the lack of absorption into the human

15  bloodstream, they would have learned that those tests were never intended to

16  demonstrate, or be a surrogate for, the absorption of a supplement into the

17  bloodstream.  Plaintiff's Counsel cannot dispute that this information was easily

18  available to them well before they filed the SAC on April 23, 2015.  This behavior

19  alone warrants sanctions under Section 1927.

20      **B. <u>Plaintiff's Counsel Continued to Pursue Claims They Knew Were</u>**

21          **<u>Meritless</u>**

22      Sanctions under §1927 are appropriate not just when a case is filed without

23  merit, but also when an attorney continues to pursue a claim once it is clear that the

24  case is without merit.  *See, e.g., Lahiri*, 606 F.3d at 1219; *see also Blue v. U.S.*

25  *Dept. of Army*, 914 F.2d 525, 533 (4th Cir. 1990) ("sanctions are appropriate for

26  pursuing a case after it becomes clear that the case is without merit") (internal

27  quotations omitted; emphasis in original); *Avirgan v. Hull*, 932 F.2d at 1582

28

1  ("[F]iling a lawsuit is not a gratuitous license to conduct infinite forays in search of

2  evidence.  When it becomes apparent that discoverable evidence will not bear out

3  the claim, the litigant and his attorney have a duty to discontinue their quest.").

4      Here, Plaintiff's Counsel continued to aggressively litigate the claims, as well

5  as the three other nearly identical class actions related to Lang's CoQ10 product,

6  long after learning that the basis for these claims was meritless.  Specific to this

7  case, Lang's counsel produced the curent <USP 2040> chapter with USP's

8  Absorption Disclaimer to Plaintiff's Counsel at the Early Neutral Evaluation on

9  April 3, 2015.  Three weeks later, on April 23, 2015, instead of dismissing the

10  lawsuit, Plaintiff's Counsel filed the SAC, again falsely representing that the USP's

11  disintegration and dissolution tests could be used to prove absorption into the

12  bloodstream.  In addition, Plaintiff's Counsel falsely alleged that they were

13  attaching a "true and correct" copy of <USP 2040> as Exhibit 3 to the SAC.

14  Plaintiff's Counsel did not reference or provide any evidence that the levels of

15  CoQ10 had ever been tested in Plaintiff's (or anyone else's) bloodstream.  This

16  conduct, too, warrants sanctions under §1927.

17      **C. Plaintiff's Counsel's Conduct Amounts to Harassment**

18      Even assuming Plaintiff's Counsel's claims had a scintilla of merit,

19  sanctionable conduct exists when an attorney "argues a meritorious claim for the

20  purpose of harassing an opponent." *Pratt*, 11 Fed. App'x. at 835.  This harassing

21  purpose can be inferred from the offending attorney's conduct. *See Pratt*, 11 Fed.

22  App'x. at 835-836 (affirming award of § 1927 sanctions, noting, "[a]lthough the

23  district court did not explicitly make a finding of frivolity or of intent to harass, it

24  did so implicitly with respect to plaintiff's counsels' actions and inactions')

25  (internal citations omitted); *see also Toombs v. Leone*, 777 F.2d 465, 471 (9th Cir.

26  1985) (affirming § 1927 sanctions, noting that, "[w]hile the district court made no

27  express finding as to sanctioned counsel's state of mind, the record sets forth

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -                                                    13cv2054

1   sufficient evidence to support its decision."). Behavior that rises to the level of

2   harassment to constitute "vexatious" conduct under §1927 includes, among other

3   things, filing numerous and meritless motions; failing to produce discovery in a

4   timely and/or responsive manner; and propounding abusive, onerous written

5   discovery requests. See *Rodriguez v. Marble Care Int'l, Inc.*, 863 F. Supp. 2d

6   1168, 1182 (S.D. Fla. 2012); see also *Primus Automotive Financial Services, Inc. v.*

7   *Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (causing delay or disruption of litigation

8   is bad faith).

9       Here, Plaintiff's Counsel's refusal to provide any substantive response to

10  discovery requests precisely aimed at the basis of Plaintiff's Counsel's criticism of

11  the Equate label is clearly reckless conduct. All the while, Plaintiff's Counsel has

12  aggressively pursued extensive discovery from Lang, in both this action and in the

13  related *Harris v. CVS* action (for which there is a discovery sharing provision with

14  this action at Dkt. 63). This has required Lang's counsel to, among other things,

15  conduct extensive document review, respond to extensive law and motion initiated

16  by Plaintiff's Counsel, and prepare many witnesses to respond to more than 80

17  subject areas in two Rule 30(b)(6) notices of deposition, all at great expense to

18  Lang.

19      Moreover, Lang's counsel's research into Ms. Cortina reveals that she is little

20  more than a shill plaintiff, having served as a stand-in class representative in

21  numerous cases across multiple jurisdictions, including several cases filed by

22  Plaintiff's Counsel.[21]   Plaintiff's Counsel has refused repeatedly to make her

23

24  [21] These cases are: (1) *Cortina v. Welch Foods, Inc.*, 1:12-cv-10070 (D. Mass. Jan.

25  11, 2012), in which Ms. Cortina was named as the representative in a putative class
    action regarding the labeling claims on a fruit juice. The case was venued in the

26  District of Massachusetts before Magistrate Judge Judith Dein, and has since been

27  dismissed. *See* Dkt. 7; (2) *Cortina v. Novartis Consumer Health, Inc.*, 3:14-cv-69
    (S.D. Cal. Jan. 10, 2014), in which Ms. Cortina was named as the representative in

28  a putative class action regarding the labeling claims on an over-the-counter

1  available for deposition; and her responses to written discovery include only

2  objections. She is not and has never been an actual participant in this case. Thus,

3  the pursuit of this case only served to benefit Plaintiff's Counsel – the real plaintiff

4  in this case.

5      This court is permitted to infer that Plaintiff's Counsel's pursuit of harassing

6  discovery and law and motion across four separate cases, while failing to respond to

7  any other discovery requests, has been solely for the purpose of harassing Lang,

8  driving up costs, and coercing an unwarranted settlement. Sanctions are warranted

9  on these grounds against Plaintiff's Counsel and their law firms.

10      **D. Plaintiff's Counsel's Attempt to Dismiss Constitutes Abandonment**

11      Finally, Plaintiff's Counsel's decision to abruptly move to dismiss this class

12  action after two years of aggressive and active litigation is nothing short of

13  abandonment, further warranting sanctions under section 1927. *See Lee v. First*

14  *Lenders Ins. Services, Inc.*, 236 F.3d 443, 445 (8th Cir. 2001) (granting defendants'

---

migraine medication. The case was venued in this Court before the Honorable
Michael Anello, and has since been dismissed. *See* Dkt. 9; (3) *Cortina v. Goya
Foods, Inc.*, 3:14-cv-169 (S.D. Cal. Jan. 23, 2014), in which Ms. Cortina was
named as the representative in a putative class action regarding the health claims on
the label of a soft drink. Ms. Cortina is represented by Fitzgerald in that case,
which is currently pending in this Court before the Honorable James Lorenz; (4)
*Cortina v. Pepsico, Inc.*, 3:14-cv-2023 (S.D. Cal. Jan. 23, 2014) and 3:14-cv-02023
(N.D. Cal. May 2, 2014), in which Ms. Cortina was named as the representative in
another putative class action regarding the health claims on the label of a soft drink.
Ms. Cortina is represented by Fitzgerald in that case, which was initially filed in the
Southern District, but has since been transferred to the Northern District, where it is
currently pending before the Honorable Edward M. Chen; (5) *Cortina et al. v.
Novartis Consumer Health, Inc.*, 3:14-cv-160 (N.D. Cal. Apr. 3, 2014) and 2:14-cv-
02918 (D. N.J. May 12, 2014), in which Ms. Cortina was named as the
representative in another putative class action regarding the labeling claims on an
over-the-counter migraine medication. The case was filed in the Northern District
of California before the Honorable James Donato, and has since been transferred to
the District of New Jersey pursuant to 28 U.S.C. § 1404(a), where it is currently
pending before the Honorable Claire Cecchi.

1    request for sanctions in class action, finding that "by filing of a class action

2    complaint, and permitting the action to proceed with discovery and motion practice

3    for over a year and a half, before abandoning the class claims without explanation,

4    unreasonably and vexatiously multiplied the proceedings).

5         Here, Plaintiff's Counsel's one-paragraph Motion to Voluntarily Dismiss,

6    filed more than two years after the initiation of this case, on the eve of the close of

7    class certification discovery, and suspiciously made just before Plaintiff's

8    deposition and the due date of responses to the targeted discovery described above

9    constitutes unreasonable and vexatious multiplication of proceedings.

10   **V.    LANG SHOULD BE AWARDED SANCTIONS**

11        Based on the above, Lang seeks sanctions, jointly and severally against

12   Plaintiff's Counsel and their law firms in the amount of $575,104.07 ($542,394.00

13   in attorneys fees and $32,755.07 in expenses. Allen Decl, ¶ 13. This amount

14   represents the attorney's fees and expenses incurred by Lang since the filing of the

15   First Amended Complaint on July 28, 2014, on the grounds that had Plaintiff's

16   Counsel conducted a reasonable inquiry into the applicability of the USP tests

17   forming the basis of the Complaint, they would have learned of the amendment

18   posted for public comment by USP on February 1, 2014, which expressly stated

19   that <USP 2040> is not intended to demonstrate, or be a surrogate for, testing of

20   absorption of a supplement into the bloodstream. Allen Decl. at ¶ 9.

21        In the alternative, Lang seeks sanctions in the amount of $501,081.40

22   ($469,199.50 in attorney fees and $31,881.90 in expenses), which is the amount of

23   attorney fees and costs Lang has incurred since April 23, 2015, when Plaintiff's

24   Counsel filed the Second Amended Complaint. Allen Decl. at ¶ 14. The Second

25   Amended Complaint (1) contained knowingly false allegations about the purpose of

26   USP's dissolution and rupture tests and (2) falsely asserted that a "true and correct"

27   copy of the USP test methods as Exhibit 3 of the SAC. Plaintiff's Counsel

28

1    absolutely knew at that time that Exhibit 3 to the SAC was outdated and did not

2    contain the USP's Absorption Disclaimer.

3         Attorney fees were charged at a single hourly rate of $385 for all attorneys

4    assigned to the case. Allen Decl. at ¶ 15. Expenses included travel expenses of

5    defense counsel to and from Rhode Island to defend the deposition of Lang

6    employees; travel expenses to Arkansas to prepare Walmart employees for their

7    depositions, as well as travel expenses incurred by Lang executives to attend the

8    ENE sessions conducted by Magistrate Judge Bartick. Id at ¶ 12.

9         Although no doubt warranted, Lang does not seek to recover all attorney fees

10   and costs incurred since the outset of the litigation or the fees and costs related to

11   the three other meritless cases filed by Plaintiff's Counsel on nearly identical

12   grounds.

13   **VI.   CONCLUSION**

14        For the foregoing reasons, Lang respectfully requests that this Court grant its

15   Motion and award Lang sanctions as set forth above representing the attorney fees

16   and expenses incurred by Lang as a direct result of Plaintiff's Counsel's

17   unreasonable and vexatious multiplication of these proceedings.

18

19   Dated: November 9, 2015                  **BARNES & THORNBURG LLP**

20

21                                            By:*/s/ Sarah E. Johnston*

22                                               Sarah E. Johnston

23                                            Attorneys for Defendants
                                              WAL-MART STORES, INC. and
24                                            LANG PHARMA NUTRITION, INC.

25

26

27

28