**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (253362)
*trevor@jackfitzgeraldlaw.com*
TRAN NGUYEN (301593)
*tran@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
SKYE RESENDES (278511)
*skye@consumersadvocates.com*
ALEXIS M. WOOD (270200)
*alexis@consumersadvocates.com*
651 Arroyo Drive
San Diego, CA 92103
Phone: (619) 696-9006

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

THAMAR SANTISTEBAN CORTINA, on behalf of herself, all others similarly situated and the general public,

Plaintiff,

v.

WAL-MART STORES, INC., and LANG PHARMA NUTRITION, INC.

Defendants.

Case No: 3:13-cv-02054-BAS-DHB

**OPPOSITION TO LANG'S MOTION FOR SANCTIONS (DKT. NO. 73)**

Judge:     Hon. Cynthia Bashant
Date:       December 14, 2015

[NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................1

FACTS ..........................................................................................................2

    I.    LANG'S CREATION AND SALE OF VESISORB COQ10 ...........................2

    II.    A HISTORY OF THE LANG COQ10 LITIGATION ......................................2

        A.    Through Independent Laboratory Testing, Plaintiff's Counsel
                Identifies Defective CoQ10 Products Being Sold by Wal-Mart
                and CVS ....................................................................................2

        B.    Lang and its Counsel Obstruct Discovery in *Harris*, Causing
                Plaintiff's Counsel to File Multiple Successful Motions to
                Compel .....................................................................................3

             1.    Defense Counsel Tells Lang's Testing Laboratory to Stop
                    Responding to Plaintiff's Subpoena, but the Court Orders
                    Compliance .......................................................................3

             2.    Plaintiff's Counsel Obtains an Order Compelling CVS's
                    Production of Over 9,600 Pages in Addition to the 378 It
                    Produced Voluntarily .......................................................4

             3.    Plaintiff's Counsel Obtains an Order Compelling Lang's
                    Production of Over 162,000 Pages in Addition to the 658
                    It Produced Voluntarily ....................................................5

             4.    After Lang's CoQ10 Manufacturer, Swiss Caps, Refuses
                    to Produce Documents, Plaintiff's Counsel Obtains a
                    Contempt Order, Attorneys' Fees, and Over 81,000
                    Pages of Key Evidence .....................................................6

             5.    Lang Improperly Withholds Documents as "Privileged,"
                    Including Unfavorable Testing Results .........................7

        C.    Defense Counsel Waits 18 Months to Seek Dismissal of *Harris*
                on Jurisdictional Grounds ..........................................................7

        D.    The *Cortina* Parties Engage in Relatively Little Litigation.....................8

i

E.     Following the *Harris* Dismissal, When the Matter Does Not Settle, Ms. Cortina Moves to Dismiss Without Prejudice, to Refile in State Court ........................................................................10

ARGUMENT ..........................................................................................................10

I.     THERE IS NO FACUTAL BASIS FOR SECTION 1927 SANCTIONS ........................................................................................10

A.     Lang's Reading of USP 2040 is Incorrect ..............................10

B.     Both Its Specification and Federal Law Require Equate to Pass USP 2040...........................................................................13

C.     Lang's Litigation Behavior Belies its Contention that USP 2040's Revised Introduction is Dispositive ............................15

D.     A Simple Chronology Demonstrates the Absurdity of Lang's Assertion that Plaintiff's Counsel Misrepresented USP 2040 ...............16

II.    THERE IS NO LEGAL BASIS FOR SECTION 1927 SANCTIONS .............17

A.     Sanctions are Not Available Because Lang's Motion at Most Raises a Disputed Merits Issue ..............................................17

B.     Sanctions are Not Available for Activities in Other Cases.....................19

C.     Lang Shows No Bad Faith, Harassment, or Multiplied Proceedings ............................................................................20

D.     Plaintiff's Counsel Cannot be Sanctioned for Allegedly Failing to Investigate the Initial Complaint.........................................21

E.     Lang Failed to Mitigate Damages..........................................22

F.     Lang Provides No Evidence of Reasonable Attorneys' Fees and Its $575,000 Request is Grossly Excessive.............................22

G.     Lang Request for $32,755 in "Travel and Other Expenses" is Improper ................................................................................25

CONCLUSION .....................................................................................................25

ii

*Cortina v. Wal-Mart Stores, Inc. et al.*, No. 13-cv-02054-BAS-DHB
OPPOSITION TO LANG'S MOTION FOR SANCTIONS

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alvandi v. CVS Pharmacy, Inc.*,
  2015 WL 3407899 (C.D. Cal. May 27, 2015) ...................................................3

*Ayala v. Enerco Group, Inc.*,
  569 Fed. Appx. 241 (5th Cir. 2014) ...........................................................17

*B.K.B. v. Maui Police Dep't*,
  276 F.3d 1091 (9th Cir. 2002) .................................................................21

*Blumberg v. Gates*,
  152 Fed. Appx. 652 (9th Cir. 2005) ...........................................................20

*Braunstein v. Ariz. Dep't of Transp.*,
  683 F.3d 1177 (9th Cir. 2012) .................................................................20

*Bruno v. Quten Research Inst., LLC*,
  2013 WL 990495 (C.D. Cal. Mar. 13, 2013) ....................................................2

*Bryan v. McPherson*,
  2007 WL 2405683 (S.D. Cal. Aug. 14, 2007) ...................................................8

*De Dios v. Int'l Realty & Invs.*,
  641 F.3d 1071 (9th Cir. 2011) .................................................................22

*DeBauche v. Trani*,
  191 F.3d 499 (4th Cir. 1999) ..................................................................17

*Doe v. Univ. of the Pac.*,
  2010 WL 5129530 (E.D. Cal. 2010) .............................................................15

*E.E.O.C. v. Great Steaks, Inc.*,
  667 F.3d 510 (4th Cir. 2012) ..................................................................17

*Estate of Blas Through Chargualaf v. Winkler*,
  792 F.2d 858 (9th Cir. 1986) ..................................................................20

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir. 2001) .................................................................20

iii

*GriD Sys. Corp. v. John Fluke Mfg. Co., Inc.*,
    41 F.3d 1318 (9th Cir. 1994) ...................................................................................19

*Harris v. CVS Pharmacy, Inc.*,
    2015 WL 4694047 (C.D. Cal. Aug. 6, 2015)..........................................................10

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983).................................................................................................23

*In re Girardi*,
    611 F.3d 1027 (9th Cir. 2010) .................................................................................21

*In re Keegan Mgmt. Co. Sec. Litig.*,
    78 F.3d 431 (9th Cir. 1996) .....................................................................................22

*In re Yagman*,
    796 F.2d 1165 (9th Cir. 1986) ....................................................................21, 22, 23

*Indus. Tech. Research Inst. v. LG Elecs., Inc.*,
    2015 WL 1522947 (S.D. Cal. Apr. 1, 2015)............................................................20

*Intel Corp. v. Terabyte Int'l*,
    6 F.3d 614 (9th Cir. 1993) .......................................................................................23

*Jordan v. Multnomah County*,
    815 F.2d 1258 (9th Cir. 1987) .................................................................................23

*Kilopass Tech., Inc. v. Sidense Corp.*,
    82 F. Supp. 3d 1154 (N.D. Cal. 2015) ....................................................................23

*Kirshner v. Uniden Corp. of Am.*,
    842 F.2d 1074 (9th Cir. 1988) .................................................................................22

*Kohler v. Flava Enters., Inc.*,
    2011 WL 2448338 (S.D. Cal. June 17, 2011)..........................................................21

*Kohler v. Flava Enters., Inc.*,
    2012 WL 460455 (S.D. Cal. Feb. 13, 2012)............................................................21

*La. Cmty. Dev. Capital Inv. Fund, Inc. v. Grambling Legends Square Taxing Dist.*,
    2015 WL 6554469 (W.D. La. Oct. 29, 2015).........................................................17

iv

*Malibu Media, LLC v. Baiazid*,
    2015 WL 6759448 (E.D. Va. Nov. 5, 2015)................................................................passim

*Matter of Case*,
    937 F.2d 1014 (5th Cir. 1991) .........................................................................19

*Miele v. Franklin Res., Inc.*,
    2015 WL 4932566 (N.D. Cal. Aug. 18, 2015) ................................................19

*Mirch v. Frank*,
    266 Fed. Appx. 586 (9th Cir. 2008).................................................................23

*Morgan v. County of Yolo*,
    277 Fed. Appx. 735 (9th Cir. 2008).................................................................17

*Morrow v. City of San Diego*,
    2013 WL 6269401 (S.D. Cal. Dec. 4, 2013) .............................................18, 21

*Nilon v. Natural-Immunogenics Corp.*,
    2015 WL 6510540 (S.D. Cal. Oct. 28, 2015) ............................................16, 22

*Pratt v. California*,
    11 Fed. Appx. 833 (9th Cir. 2001)...................................................................22

*Roadway Express Inc. v. Piper*,
    447 U.S. 752 (1980).........................................................................................25

*Sanchez v. Bank of Am.*,
    2010 WL 2382347 (N.D. Cal. June 10, 2010).................................................23

*Schmitzer v. County of Riverside*,
    26 Fed. Appx. 701 (9th Cir. 2002)...................................................................20

*Serrano v. Unruh*,
    32 Cal. 3d 621 (1982) .....................................................................................25

*Surrell v. Cal. Water Serv. Co.*,
    2006 WL 1153758 (C.D. Cal. 2006).................................................................15

*United States v. Austin*,
    749 F.2d 1407 (9th Cir. 1984) .........................................................................25

*Welch v. Met. Life Ins. Co.*,
    480 F.3d 942 (9th Cir. 2007) ...........................................................................23

*Wilson v. PFS, LLC*,
    2008 WL 789898 (S.D. Cal. Mar. 20, 2008) ..................................................22

*Zetwick v. County of Yolo*,
    2015 WL 5600349 (E.D. Cal. Sept. 22, 2015)..........................................15, 16


**Statutes**

28 U.S.C. § 1920 ....................................................................................................25

28 U.S.C. § 1927 .........................................................................................1, 23, 25


**Regulations**

21. C.F.R. Part 111 .................................................................................................13

21 C.F.R. § 111.70(a) .............................................................................................13

21 C.F.R. § 111.73 ..................................................................................................13

21 C.F.R. § 111.73(b)(2) .........................................................................................13

21 C.F.R. § 111.75(a)(1)(i) ......................................................................................13

21 C.F.R. § 111.75(c)(1) ..........................................................................................13

21 C.F.R. § 111.77(a) ..............................................................................................14

*Cortina v. Wal-Mart Stores, Inc. et al.*, No. 13-cv-02054-BAS-DHB
OPPOSITION TO LANG'S MOTION FOR SANCTIONS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **INTRODUCTION**

Lang requests more than $575,000 of sanctions pursuant to 28 U.S.C. § 1927 for the following purported conduct, which it calls "clear[ly] reckless":

> Plaintiff's Counsel (1) failed to conduct a reasonable investigation before filing the Complaint or the FAC; (2) continued to aggressively litigate this and related actions after learning Plaintiff's claims were baseless; (3) engaged in discovery tactics constituting harassment; (4) misled the Court by filing the SAC, knowing that Exhibit 3 to the SAC was an outdated version of <USP 2040> [sic] that did not contain USP's Absorption Disclaimer; and (5) now attempts to abandon this litigation after more than two years, freeing them to re-file again elsewhere and continue to drive up costs for Lang.

(Mot. at 14.) Items 1, 2, and 4 are related, all based on Lang's assertion that plaintiff's counsel improperly did not dismiss the case after USP 2040's introduction was revised on August 1, 2014 to add language Lang now contends is dispositive of plaintiff's claims.

Lang's motion, however, is factually baseless. Point I. Lang's interpretation of USP 2040's revised introduction is incorrect. Point I.A. Contrary to Lang's assertion that this testing is "irrelevant," both its specification and federal law require Equate CoQ10 to pass USP 2040, as do Lang's retail customers, including Wal-Mart. Point I.B. Lang's litigation behavior also belies its position. Although plaintiff's April 23, 2015 Second Amended Complaint set forth the revised introduction verbatim (SAC ¶ 32)—also rendering frivolous Lang's fourth grounds for sanctions noted above, *see also* Point I.D—neither defendant moved to dismiss. Nor have they, since learning of the revised introduction last March, moved for summary judgment in this or any other Lang CoQ10 litigation, or filed the Rule 11 motion they threatened at the April 3, 2015 ENE, if plaintiff did not dismiss her case. Defendants' litigation behavior thus illustrates the merit of plaintiff's claims. Point I.C.

Lang's motion is also legally baseless. Point II. At most, the motion raises a disputed merits question about the extent to which USP 2040 testing supports plaintiff's claims, which § 1927 does not cover. Because the Court already found plaintiff's allegations in this regard plausible, the ordinary pursuit of her claims cannot be frivolous or vexatious. And USP 2040 testing is just one of piece of plaintiff's case. Point II.A. Moreover, although Lang's motion

is based on "four separate cases" (Mot. at 20) "in multiple courts" (*id.* at 1), activities in other cases are not sanctionable under § 1927. Point II.B. And § 1927 sanctions are only available for "multiplied," bad faith proceedings, but Lang makes no such showing, and the docket reveals almost *no* proceedings. If anything, plaintiff's counsel *obviated* the need for duplicative proceedings by agreeing to double-track Lang 30(b)(6) depositions noticed in *Harris*, and insisting on discovery sharing. Point II.C. Lang's request for sanctions on the basis that plaintiff's counsel supposedly "failed to conduct a reasonable investigation before filing the [initial] Complaint" is barred as a matter of law, and its premise demonstrably false. Point II.D. Having discovered the basis for the supposedly-sanctionable conduct in March 2015, Lang also improperly failed to mitigate damages by waiting eight months to move for sanctions. Point II.E. Even if sanctions were available, Lang's motion makes no showing its request is reasonable, and it appears grossly excessive. Point II.F. Finally, Lang requests more than $32,000 in "travel and other expenses" that are not available under § 1927. Point II.G.

Accordingly, the Court should deny Lang's motion.

## FACTS

### I.   LANG'S CREATION AND SALE OF VESISORB COQ10

Lang is a supplier of private label "national brand equivalent" dietary supplements to food, drug, mass market, and club retailers. In late 2011, Lang set out to create a product that, like Qunol CoQ10, could claim "three times" better absorption than so-called "regular" formulations containing CoQ10 powder suspended in oil. Lang settled on a technology claiming to increase CoQ10 absorption, called Vesisorb (*see* Fitzgerald Decl. Ex. 1), whose efficacy Lang contends is supported by a 2001 German 24-hour clinical study described in a 2009 article, referred to here as *Relative Bioavailability*. (*See* SAC ¶¶ 42-43 & Ex. 6.)

### II.   A HISTORY OF THE LANG COQ10 LITIGATION

#### A.   Through Independent Laboratory Testing, Plaintiff's Counsel Identifies Defective CoQ10 Products Being Sold by Wal-Mart and CVS

Following the successful resolution of a class action involving national brand Qunol CoQ10, *see Bruno v. Quten Research Inst., LLC*, 2013 WL 990495 (C.D. Cal. Mar. 13, 2013),

2

1   and seeking efficiencies of scale by testing other CoQ10 products, in the summer of 2013,

2   plaintiff's counsel identified two seemingly defective products: Wal-Mart's "3 times better

3   absorption" Equate CoQ10, and CVS's "6X Better Absorption" Ultra CoQ10. Counsel had

4   no idea at the time they were the identical Lang-supplied product. (Dkt. No. 74-1, November

5   16, 2015 Declaration of Jack Fitzgerald ("Nov. 16 Fitzgerald Decl.") ¶¶ 2-3.) Counsel thus

6   filed this action on September 3, 2013 (Dkt. No. 1), and one against CVS on December 18,

7   2013, *Harris v. CVS Pharmacy, Inc.*, No. 13-edcv-2329-AB (AGRx) (C.D. Cal.).[1]

8       **B.    Lang and its Counsel Obstruct Discovery in *Harris*, Causing Plaintiff's**

9           **Counsel to File Multiple Successful Motions to Compel**

10      Lang and defense counsel were repeatedly obstructionist in *Harris*, forcing plaintiff's

11  counsel to file several discovery motions, which were almost entirely successful.

12          **1.    Defense Counsel Tells Lang's Testing Laboratory to Stop Responding**

13              **to Plaintiff's Subpoena, but the Court Orders Compliance**

14      CVS's initial disclosures identified Advanced Botanical Testing & Consulting, Inc.,

15  and its principal, Dr. Wendi Wang, as knowledgeable about testing on Lang's CoQ10. Harris

16  subpoenaed Advanced Botanical, and Dr. Wang was initially cooperative, producing a batch

17  of testing reports showing rupture and dissolution failures, and promising additional

18  documents. However, Lang's counsel shortly later told Dr. Wang there was "nothing further

19  to do" in response to the subpoena. Dr. Wang followed defense counsel's directive, refusing

20  to produce more documents. Plaintiff was forced to file a motion to compel, which, although

21  fiercely contested, the court largely granted, resulting in Advanced Botanical's production of

22  key testing results and communications. (*See* Fitzgerald Decl. Exs. 2-3.)

23  ─────────────────

24  [1] After more testing showed the same defect with Walgreen's version, counsel filed a third

25  lawsuit in January 2015, *Reynolds et al. v. Walgreen Co.*, No. 15-cv-324 (N.D. Cal.), which
    was soon voluntarily dismissed, given Walgreen's minimal sales. In March 2015, after CVS

26  repackaged the product but testing showed problems persisted, counsel filed a second suit
    against CVS, *Alvandi v. CVS Pharmacy, Inc. et al.*, No. 15-cv-1503 (C.D. Cal.). Alvandi and

27  Harris moved to consolidate, but the court dismissed *Alvandi* for lack of subject matter
    jurisdiction. *Alvandi v. CVS Pharmacy, Inc.*, 2015 WL 3407899 (C.D. Cal. May 27, 2015).

28

### 2. Plaintiff's Counsel Obtains an Order Compelling CVS's Production of Over 9,600 Pages in Addition to the 378 It Produced Voluntarily

Harris served written discovery requests on CVS in March 2014. Using a "rolling" production to delay the litigation, after months, and despite extensive meet-and-confers, CVS had produced only 105 substantive pages and a 273-page document retention policy. In opposing plaintiff's motion to compel, defense counsel represented that "CVS does not <u>have</u> more documents responsive to Plaintiff's discovery requests, and in all likelihood, very few documents were ever generated by CVS in relation to the sale of Ultra," calling plaintiff's motion "a thinly-veiled attempt to drive up cost and inconvenience to CVS." Defense counsel represented that because "[t]he launch of Ultra took place in 2012, prior to CVS implementing a new system of email archiving" called Source One, "any other documents or emails . . . would only be accessible in a non-indexed, non-searchable format that can only be recovered by conducting an exorbitantly expensive and time-consuming recovery process." (*Id.* Ex. 4 at 2-3.) According to a supporting declaration, CVS employees were incrementally transferred onto the Source One system by July 2013, with "a majority of CVS employees" rolled into the system "during late 2012/early 2013." (*Id.* Ex. 7, Bouvier Decl. ¶ 3.)[2]

Defense counsel had never told plaintiff's counsel of the existence of the Source One database, instead repeatedly representing that CVS was incapable of searching for documents electronically. (*See id.* ¶ 6 & Ex. 5.) During the hearing, the court was troubled that CVS had neither searched the database, nor even determined whether any of the 14 relevant custodians had been transitioned to Source One such that at least some of their relevant communications might be captured. The court directed CVS to identify the transition dates. (*Id.* Ex. 9 at 14-15.) Initially, defense counsel only told plaintiff that "the relevant custodians began migrating to Source One starting in mid-2011, and the last custodian was converted to Source One in

---

[2] In a second declaration, CVS's Senior Legal Counsel revealed that CVS had not put in place a litigation hold until five months after plaintiff sent his demand letter (which was also a month after he served written discovery requests), and that relevant evidence was lost as a result. (*Id.* Ex. 6, Feisthamel Decl. ¶¶ 4-8, 10b, 14b, 15; *see id.* Ex. 8 at 1-2 (Pl's. Suppl. Br.).)

February of 2013." Only when plaintiff's counsel demanded CVS identify the *specific* transition dates for each custodian did defense counsel reveal that most were transitioned before their involvement in Ultra even began, with the three primary employees all transitioned in July or August *2011*, months before CVS even began talking to Lang about a potential CoQ10 product, and a year before CVS ever sold Ultra. (*Id.* ¶ 11 & Ex. 10.) The court also ordered CVS to meet-and-confer on search terms, and produce the resulting documents. (*Id.* Ex. 11; *see also id.* Ex. 9 at 16.) In November 2014, CVS produced over 9,600 additional documents captured by a proper Source One search finally conducted only under court order, *8 months* after plaintiff served his document requests. (*Id.* ¶ 13.)

But CVS's production was still incomplete. CVS had redacted the names of consumer-witnesses who complained about the Lang CoQ10, heavily redacted documents on the basis of supposed "trade secrets," and served an insufficient privilege log that frustrated plaintiff's ability to evaluate the claims of privilege. After additional meeting-and-conferring, plaintiff was forced to file a second motion to compel. (*See id.* Exs. 12-13.) The Court again largely granted the motion, also ordering CVS to produce some supposedly "privileged" documents for *in camera* review. (*See id.* Ex. 14.)

**3.**     **Plaintiff's Counsel Obtains an Order Compelling Lang's Production of Over 162,000 Pages in Addition to the 658 It Produced Voluntarily**

Harris served Lang with a document subpoena in April 2014, with Lang's response due May 12. Plaintiff agreed to multiple extensions, conditioned on Lang producing all non-objectionable documents by May 28. But Lang did not timely respond or object, and its untimely response was just boiler-plate objections and 50 pages of documents, with a letter from defense counsel stating that "today we are commencing a rolling production." Two weeks later, Lang sent 194 pages. Then a week later, 97 pages. Then another week later, 161 pages. Then Lang stopped producing documents. Only after plaintiff inquired, on July 18 Lang said it would complete its production that day or July 21 at the latest. But Lang did not do so until August 8, when it sent just 154 more pages, for a total production of 658 pages, 165 just publicly-available scientific articles. The 493 substantive pages were heavily

redacted, and each bore a giant "CONFIDENTIAL" stamp stretched from the bottom-left to top-right corner. (*See id.* Exs. 15-16, 18.)

Believing Lang's production was deficient, plaintiff's counsel engaged in meet-and-confer efforts, but Lang refused to produce more documents. Needing to seek court relief, plaintiff twice asked whether Lang would stipulate, pursuant to Rule 45(f), to having a motion to compel heard before Central District of California Magistrate Judge Rosenberg, who was already familiar with similar issues from the motion to compel CVS. But defense counsel ignored the requests. Plaintiff thus hired local counsel and filed a miscellaneous action in Rhode Island to enforce the subpoena. (*Id.* ¶ 18.) Only after plaintiff's counsel incurred this expense did Lang begin *insisting* on transfer to Judge Rosenberg. (*Id.* ¶¶ 17-18 & Ex. 17.)

The matter was transferred. Despite Lang's assertion, like CVS previously, that plaintiff's motion was "egregious," and "[t]he merits (or lack thereof) . . . unimportant to Plaintiff" (*id.* Ex. 17 at 2), Judge Rosenberg, among other things, overruled most of Lang's objections, ordered Lang to meet and confer on custodians and search terms and to undertake additional, proper searching, and ordered Lang to revise its deficient privilege log. (*Id.* Exs. 19-20.) In March 2015, under court order, Lang produced over 162,000 new pages. (*Id.* ¶ 25.)

### 4. After Lang's CoQ10 Manufacturer, Swiss Caps, Refuses to Produce Documents, Plaintiff's Counsel Obtains a Contempt Order, Attorneys' Fees, and Over 81,000 Pages of Key Evidence

In April 2014, Harris served a document subpoena on Lang's CoQ10 manufacturer, Swiss Caps USA, Inc., which did not object and initially produced 87 pages, promising the balance shortly. However, Swiss Caps made no further production and soon began ignoring plaintiff's inquiries. Plaintiff's counsel retained local Miami counsel and brought an action seeking compliance, *Harris v. Swiss Caps USA, Inc.*, No. 14-24729 (S.D. Fla.). When Swiss Caps ignored the court's order to respond, the court granted the motion, requiring full production. When Swiss Caps made no such production, the court granted a second motion to compel, issuing a contempt citation and awarding attorneys' fees. Although the court later vacated the rulings when the judge recused himself after realizing his wife had previously

6

represented Swiss Caps, the court to whom the matter was assigned similarly compelled a full production and ordered the payment of attorneys' fees. Swiss Caps eventually produced over 81,000 pages of documents, including the manufacturing batch records for every batch of Lang CoQ10 ever produced, key evidence in the case. (*Id.* ¶¶ 26-32, 62 & Exs. 21-27.)

### 5. Lang Improperly Withholds Documents as "Privileged," Including Unfavorable Testing Results

Despite Lang's sizeable production in March 2015, it had still failed to comply fully with the court's order, forcing plaintiff to file a second motion. Most importantly, Lang's revised privilege log revealed that 13 documents withheld on the basis of "Attorney Client, Attorney Work Product," with a subject matter described as "CoQ10 Testing"—suggesting they were routine attorney-client communications *about* CoQ10 testing—were in fact "CoQ10 Testing *conducted* at the direction of attorneys *in connection with the litigation*." Because CVS's initial disclosures said it would rely on such testing, plaintiff demanded the withheld results, arguing that defendants could not engage in such cherry-picking. Only after plaintiff filed the motion did Lang finally agree "voluntarily" to produce the testing results, in the hopes of mooting the motion. But the court still ordered Lang to produce them. (*Id.* Exs. 28-30.) And the court also ordered Lang to produce several other documents it improperly withheld as privileged. (*Id.* Exs. 31-32.)

### C. Defense Counsel Waits 18 Months to Seek Dismissal of *Harris* on Jurisdictional Grounds

On June 8, 2015—18 months after the action was filed in December 2013—defense counsel moved to dismiss *Harris* arguing that, at the time of filing, CVS's sales were below CAFA's minimum amount in controversy. Since counsel must have known the sales early on, it either missed the purported jurisdictional deficiency for 18 months, or knew of it but deliberately avoided seeking dismissal while continuing to bill its client, Lang.[3]

---

[3] Defense counsel improperly instructed David Lang not to respond to deposition questions about this 18-month delay, based on an objection that the questions were "argumentative" (Fitzgerald Decl. Ex. 44 at 233:15-234:21). *See Bryan v. McPherson*, 2007 WL 2405683, at

7

**D.     The *Cortina* Parties Engage in Relatively Little Litigation**

In comparison to *Harris*, this case has had few proceedings and little discovery. Plaintiff filed her Complaint in September 2013 and in October 2013, Wal-Mart moved to dismiss. (Dkt. Nos. 1, 15.) In June 2014, the Court dismissed the Complaint without prejudice. (Dkt. No. 26.) On July 28, plaintiff filed her First Amended Complaint (Dkt. No. 29), and on August 28, Wal-Mart again moved to dismiss (Dkt. No. 32). On January 20, 2015, the Court largely denied Wal-Mart's motion (Dkt. No. 42), and Wal-Mart filed its Answer on February 10 (Dkt. No. 43).

Magistrate Judge Bartick then held an Early Neutral Evaluation on April 3, though the matter did not settle. (Dkt. No. 49.) During the ENE, defense counsel presented to plaintiff a document it represented was a revised version of USP 2040, on which it had highlighted a four-sentence introductory paragraph. (Allen Decl. ¶ 11; Fitzgerald Decl. ¶ 38 & Ex. 33.) As communicated by Judge Bartick, defendants argued that the revised USP 2040 introduction was dispositive of plaintiff's claims, entitling defendants to summary judgment and, if plaintiff did not dismiss her case, Rule 11 sanctions. (Fitzgerald Decl. ¶ 39.)

This was the first time plaintiff's counsel had seen the revised language, but after review, counsel concluded it did not undermine plaintiff's case. Instead, the revised introduction appeared to support plaintiff's claims, making clear that USP testing provides information about "quality control," the "performance characteristics of dietary supplement finished dosage forms," and "manufacturing process issues . . . that would affect the release characteristics of the final dosage forms." (*Id.* ¶¶ 38-40.)

With Wal-Mart's written consent, on April 23, plaintiff filed her SAC (Dkt. No. 51). Although plaintiff's counsel did not believe the revised USP 2040 introduction materially affected the claims and defenses, in the abundance of caution, because defendants had threatened a Rule 11 motion, and because counsel did not want any possibility that anyone

---

*1 (S.D. Cal. Aug. 14, 2007) ("Defendant's counsel's objections were that the questions were . . . improper . . . and she therefore instructed her client not to answer. Counsel's objections may be sound . . . . The instruction not to answer was improper.").

*Cortina v. Wal-Mart Stores, Inc. et al.*, No. 13-cv-02054-BAS-DHB
OPPOSITION TO LANG'S MOTION FOR SANCTIONS

might ever think counsel hid something defendants considered material, the SAC expressly pled and set forth verbatim the revised introduction (SAC ¶ 32). (*See* Fitzgerald Decl. ¶ 41.)

Discovery opened following the ENE. (Dkt. No. 50.) Plaintiff served Wal-Mart with written requests on April 22. Wal-Mart requested, and plaintiff provided multiple extensions of time to respond. (*See* Dkt. Nos. 54, 58.) Between May 22 and July 16, Wal-Mart—like CVS and Lang previously—made a "rolling" document production totaling 1,554 pages. (Nov. 16 Fitzgerald Decl. ¶ 27.) Believing Wal-Mart's responses were deficient, on July 31, plaintiff's counsel requested a meet-and-confer conference. (Dkt. No. 72-4.) The parties conferred on September 3, with Wal-Mart agreeing to provide limited additional information. (Fitzgerald Decl. Ex. 34.)

Plaintiff served Lang with discovery requests on July 20. Lang did not respond until September 11, and its responses were non-substantive, only boilerplate objections. (Nov. 16 Fitzgerald Decl. Exs. 19-21.) Lang later served "further" responses to plaintiff's interrogatories and requests for admission, adding more grounds for objecting, but also providing little substantive information. (Dkt. Nos. 72-7, 72-8.) As was plaintiff's expectation, Lang did not produce any new documents, but rather relied on its production in *Harris*, as it was entitled by the parties' discovery-sharing agreement. (Fitzgerald Decl. ¶ 44.)

On July 23, plaintiff served Wal-Mart with a deposition notice, calling for deposition on September 22. (Nov. 16 Fitzgerald Decl. ¶ 23 & Ex. 16.) On August 11, the parties—who had by then agreed to a settlement conference with Judge Bartick—agreed to take the deposition off-calendar. (*Id.* ¶ 24 & Ex. 17.)

In *Harris*, the parties scheduled Lang's 30(b)(6) depositions for August 4 to 6. When defense counsel said it would not produce witnesses "twice to testify on the same topics," plaintiff's counsel was "amenable to taking Lang's deposition in both cases," under three conditions, the first, that "the parties in Cortina stipulate that all party and third-party discovery obtained in Harris may be used in Cortina, and vice versa." (Nov. 16 Fitzgerald Decl. Ex. 12 at p. 65.) Accordingly, on August 3, the parties filed their discovery-sharing stipulation (Dkt. No. 63), which Judge Bartick granted the next day (Dkt. No. 65).

9

**E.      Following the *Harris* Dismissal, When the Matter Does Not Settle, Ms. Cortina Moves to Dismiss Without Prejudice, to Refile in State Court**

Over plaintiff's vigorous opposition, on August 6, the *Harris* court dismissed the case without prejudice to refile in a court of competent jurisdiction, *i.e.*, state court. *Harris v. CVS Pharmacy, Inc.*, 2015 WL 4694047, at *8 (C.D. Cal. Aug. 6, 2015). Nevertheless, following Lang's 30(b)(6) depositions, because the parties understood the litigation would continue (*see* Nov. 16 Fitzgerald Decl. ¶ 5), they requested Judge Bartick's assistance with a settlement conference (*see* Dkt. No. 66), which took place on August 25 (Dkt. No. 70).

Though the matter did not settle, the parties continued to negotiate privately. When discussions did not seem promising, on October 5, plaintiff advised defendants that, "[b]ased on information produced by Wal-Mart, your prior motion to dismiss *Harris v. CVS*, and some statements you recently made indicating that you may file a similar motions in *Cortina*," she might dismiss her action without prejudice. (Nov. 16 Fitzgerald Decl. Ex. 4.)[4] Plaintiff requested defendants either stipulate to dismissal, or join in a motion to definitively establish the Court's jurisdiction. (*See id.* Exs. 3-5.) Defense counsel never agreed, but on October 19, issued subpoenas to the laboratories that performed the USP testing supporting plaintiff's claims. (Fitzgerald Decl. Ex. 35.)

## <u>ARGUMENT</u>

## I.   THERE IS NO FACUTAL BASIS FOR SECTION 1927 SANCTIONS

### A.   Lang's Reading of USP 2040 is Incorrect

No reasonable person could interpret USP 2040 as Lang has here, for the purpose of seeking more than $575,000 in sanctions against plaintiff's counsel. Fairly read, the introductory language to USP 2040 provides only that a dissolution test should not be used

---

[4] Given the *Harris* dismissal, defendants' threats to bring a similar motion here, and plaintiff's discussing dismissal with defense counsel at length, Lang's complaint that plaintiff initially provided no explanation for her dismissal (Mot. at 13) is disingenuous. (*See, e.g.*, Fitzgerald Decl. Ex. 36.) Lang also provides no authority that any such explanation is required. Ironically, plaintiff's dismissal filing (Dkt. No. 71) was modeled on one defense counsel filed a few years ago, where it, too, filed a longer reply. (Fitzgerald Decl. ¶¶ 47-48 & Exs. 37-38.)

10

to "demonstrat[e]" or *prove* absorption "unless an in vitro-in vivo correlation (IVIVC) has been established." Lang commits the logical fallacy of denying the antecedent (sometimes called the inverse error because the fallacy is inferring the inverse from the original statement), when it asserts that the 2040 introductory language providing that a successful dissolution test does not necessarily evince successful absorption, *also* means that a *failed* dissolution test cannot evince a *lack* of absorption. The first few sentences of USP 2040's revised introduction demonstrate just the opposite: the tests "assess performance characteristics of dietary supplement finished dosage forms," and "detect manufacturing process issues . . . that would affect the release characteristics of the final dosage forms."

This is the classic "necessary/sufficient" distinction: USP 2040 merely provides that a passing dissolution or disintegration test is a *necessary*, but not *sufficient* condition to show absorption or bioavailability (unless a scientifically-valid correlation between a passing USP test and in-vivo absorption has been established). (*See also* November 27, 2015 Declaration of Susan J. Schneipp ("Schneipp Decl.") ¶¶ 25-29.)

Lang's sanctions motion employs imprecise and circuitous language to misrepresent both plaintiff's allegations and USP 2040's revised introduction. For example:

- "Plaintiff's Counsel . . . assert[ed] that USP dissolution testing could be used as proof of a product's efficacy and absorption" (Mot. at 5).

- "Plaintiff's Counsel alleges throughout the FAC that <USP 2040> [sic] is a measure of the efficacy and bioavailability (blood absorption) of Equate CoQ10" (*id.* at 8).

- "[T]he chapter 2040 disintegration and dissolution tests relied on by Plaintiff's Counsel are to be used as quality control testing – rather than bioavailability or efficacy testing, despite claims throughout the FAC" (*id.* at 10).

- "[T]he only support for Plaintiff's criticism of the Equate absorption claims in the SAC were USP disintegration and dissolution tests, which USP expressly states are not intended for such measurements." (*Id.* at 11.)

- "[T]he FAC and SAC were intentionally revised to imply that USP's tests are proof of absorption into the bloodstream and bioavailability." (*Id.* at 17.)

11

- Plaintiff's counsel "[sh]ould have learned that those tests were never intended to demonstrate, or be a surrogate for, the absorption of a supplement into the bloodstream." (*Id.*)

But plaintiff has never alleged that USP test results directly "measure" or constitute "proof of" absorption. Rather, as Lang admits elsewhere, plaintiff "asserted [that failed USP tests were] evidence of the *lack of absorption* into the human bloodstream," while Chapter 2040 merely provides that the tests are not "intended to *demonstrate, or be a surrogate for*, the absorption of a supplement into the bloodstream." (Mot. at 17 (emphasis added).)

This is consistent with how plaintiff previously summarized her allegations: "It is possible to test and accurately determine the rupture and dissolution of a nutrient offered in the form of a softgel, and thus to test its bioavailability indirectly." (Dkt. No. 35 at 3; *see also id.* at 11 ("[E]ven if, as Wal-Mart contends, there may be direct methods of testing bioavailability, . . . plaintiff's indirect testing still shows it is plausible that Equate's absorption claims are misleading.").) Plaintiff prevailed on this issue. (*See* Dkt. No. 42 at 7.)

Indeed, plaintiff alleges that "[r]upture is the first step in dissolution, and dissolution the first step in absorption; thus because of Equate's rupture problems and substandard dissolution, it cannot possibly provide the 'clinical strength,' 'high absorption,' and '3x better absorption' Wal-Mart and Lang claim" (SAC ¶ 5). Plaintiff continues, "the USP tests for rupture and dissolution show whether a product is *likely* to break up early enough in the digestive process to provide an effective amount of the enclosed CoQ10, and . . . whether the vitamin is *likely* to adequately dissolve so as to provide substantial bioavailability." (*Id.* ¶ 25 (emphases added).) Plaintiff further alleges that the digestion of a CoQ10 softgel "begins with the timely rupture, or break up, of the gelatin outer shell," because "a pill that does not timely rupture will pass through the gastrointestinal tract without dissolution and then absorption commencing as quickly, or at all." (*Id.* ¶ 26.) Likewise, "because dissolution is the first step in, and a prerequisite to, the absorption of a vitamin," plaintiff alleges that "information about a supplement's dissolution rate provides an accurate idea of how effective [it] is *likely* to be when it is orally ingested." (*Id.* ¶ 27 (emphasis added); *compare* Schneipp Decl. ¶ 29.)

12

These allegations remain viable in the face of—and in fact are *supported by*—USP 2040's revised introduction. In allegations reminiscent of USP 2040, plaintiff contends that:

> The wide divergence in Equate's dissolution results . . . suggest some defect in its formulation, manufacturing (including possibly relating to its outer softgel gelatin coating), packaging, or distribution resulting in inconsistent batches of Equate CoQ10, many of which provide the consumer little or no effect, and which may degrade quickly during the product's shelf life.

(SAC ¶ 60; *see also id.* ¶ 4 ("[A] significant disparity in testing results suggests Equate is manufactured without adequate quality control, meaning consumers cannot obtain, much less expect, consistent and predictable results from one bottle of Equate to the next.").)

**B.     Both Its Specification and Federal Law Require Equate to Pass USP 2040**

Contrary to the impression conveyed by Lang's sanctions motion, USP 2040 is integral to its CoQ10 business. Federal Current Good Manufacturing Practice (cGMP) regulations, 21. C.F.R. Part 111, require dietary supplement manufacturers like Lang to "establish a specification for any point, step, or stage in the manufacturing process where control is necessary to ensure the quality of the dietary supplement," 21 C.F.R. § 111.70(a). In addition, manufacturers must establish specifications "for the purity, strength and composition of" dietary supplements. *Id.*§ 111.73(b)(2).

Lang's own CoQ10 specification requires that the product pass USP 2040's disintegration test. (Fitzgerald Decl. Exs. 39-41.) Federal regulations further require a manufacturer to "determine whether the specifications you establish under 111.70 are met," 21 C.F.R. § 111.73, including through "appropriate test[s]," *id.* § 111.75(a)(1)(i), and "select[ing] one or more established specifications . . . [that] would verify that the production and process control system is producing a dietary supplement that meets all product specifications," *id.* § 111.75(c)(1), which for Lang's CoQ10 includes USP 2040 (*see* Fitzgerald Decl. Ex. 42). When a product does not meet its specification, the manufacturer "must reject the component, dietary supplement, package or label unless such personnel approve a treatment, an in-process adjustment, or reprocessing that will ensure the quality of

13

the finished dietary supplement," 21 C.F.R. § 111.77(a).[5] (*See also* Schneipp Decl. ¶¶ 21-24, 27-28.)

In 2013, Lang hired Sean Campbell as Director of Quality Assurance, specifically to ensure compliance with these cGMP regulations. (Fitzgerald Decl. Ex. 43 at 20:12-14, 21:15-22:14.) When asked on July 2, 2015—almost a year after USP 2040's introduction was revised—what role USP plays in Lang's business, Campbell responded:

> I think the FDA set forth, you know, clearly that it's important for all manufacturers to establish product specifications and the testing methods that support those specifications. I'm sure those specifications can be referenced to the USP, because it's a common source, and that's where the industry or customers or people watching will go first . . . .

(*Id.* at 83:3-22; *see also generally id.* at 83:23-85:23.)

Contrary to Lang's sanctions-inspired assertion that USP 2040 testing is "irrelevant" (Mot. at 10), not only has its Director of Quality Assurance testified to just the opposite, but Lang admitted that its "customers demand or require at times that certain of Lang's products meet USP standards" (*see* Fitzgerald Decl. Ex. 44 at 114:2-7). CVS's Director of Product Assurance, Scott MacLennan, confirmed this, testifying that "[a]nything that involves our product lots that does not meet a requirement within the USP or our protocol, we would like to be notified." (*Id.* Ex. 45 at 148:2-9; *see also id.* at 87:16-88:13.) Wal-Mart likewise requires USP 2040 testing. (*Id.* Ex. 46.) Unsurprisingly, both CVS's and Wal-Mart's laboratories have tested Lang CoQ10 for USP 2040 disintegration. (*Id.* Exs. 47-48.)

The principal of Lang's own testing laboratory, Dr. Wendi Wang, also confirmed the importance of USP 2040 testing in determining the efficacy of dietary supplements like

---

[5] The allegation that USP standards are voluntary for dietary supplements (*see*, *e.g.*, SAC ¶ 25)—an allegation on which Lang repeatedly seizes despite knowing well the regulatory requirements (*see* Mot. at 1, 3-6, 10, 16-17)—is actually unnecessarily favorable to Lang, since such standards are not merely voluntary under the present circumstances. Rather, manufacturers must establish specifications, and may choose what standards to use. But once a manufacturer chooses a particular standard, including one promulgated by USP (as Lang itself has done), then federal regulations require that the product adhere to that standard.

Lang's CoQ10, testifying that USP 2040 "is a quality control testing parameter," and that "[w]hatever product you are making, if you developed it, it is supposed to dissolve or disintegrate at a certain particular time[], you want to make sure all your future production . . . all perform to that same standard" (*see id.* Ex. 49 at 73:1-10.) When asked why dietary supplement manufacturers "care about disintegration" as reflected in USP 2040, Wang testified, "[t]hat seems pretty obvious. . . . [I]f you take a product in at – it does not even disintegrate, it stays like a rock, you know, nothing is going to come into." (*Id.* at 73:21-74:3.) When asked whether USP 2040 disintegration testing "is a matter of efficacy," Dr. Wang agreed "[i]t is the minimum basically to assure something . . . [is] going to become useful" when someone consumes a dietary supplement. (*Id.* at 74:4-9.)

## C.   Lang's Litigation Behavior Belies its Contention that USP 2040's Revised Introduction is Dispositive

Lang and its counsel have known about USP 2040's revised introduction since last March. (Allen Decl. ¶ 8.) When they disclosed it to plaintiff's counsel at the April 3 ENE, they threatened a Rule 11 motion if plaintiff did not dismiss (Fitzgerald Decl. ¶ 39). This was, however, posturing: defendants immediately answered the SAC filed three weeks later, rather than moving to dismiss (*see* Dkt. Nos. 60-61), even though it expressly pled the revised introduction (SAC ¶ 32). And in the ensuing seven months, defendants did not move for summary judgment, nor file or serve the threatened Rule 11 motion. Lang and its counsel also did not, in the year between the August 1, 2014 revision to USP 2040, and the August 6, 2015 jurisdictional dismissal in *Harris*, seek any ruling there, such as through summary judgment, that USP 2040's revised introduction is dispositive of Harris's effectively identical claims.

"[D]efendant's failure to file a motion to dismiss and defendant's treatment of the case as having merit is evidence that the case indeed has merit[.]" *See Zetwick v. County of Yolo*, 2015 WL 5600349, at *3 (E.D. Cal. Sept. 22, 2015) (citing *Surrell v. Cal. Water Serv. Co.*, 2006 WL 1153758, at *4 (C.D. Cal. 2006)); *see also Doe v. Univ. of the Pac.*, 2010 WL 5129530, at *6 (E.D. Cal. 2010) (defendant's failure to make informal requests that plaintiff dismiss, failure to file a motion to dismiss, and participation in six months of discovery was

15

evidence that plaintiff's case had merit). In *Zetwick*, a California court denied § 1927 sanctions because, like here, "[i]f the Defendants had truly believed that Plaintiff's case was frivolous and Plaintiff was unreasonable from the beginning, they arguably would have made some attempt to have the case dismissed before engaging in the discovery process." *Zetwick*, 2015 WL 5600349, at *3; *compare Nilon v. Natural-Immunogenics Corp.*, 2015 WL 6510540, at *6 (S.D. Cal. Oct. 28, 2015) ("If . . . defense counsel had been diligent early on in deposing Plaintiff . . . instead of waiting more than five months . . . , some of the filings which Defendant now characterizes as excess may have been avoided, or at the very least conducted at an earlier point in time in order to resolve this case."); *Malibu Media, LLC v. Baiazid*, 2015 WL 6759448, at *5 (E.D. Va. Nov. 5, 2015) (denying sanctions where "each of the actions about which defendant now complains have more appropriately tailored sanctions that could have been sought at an earlier stage").

### D.   A Simple Chronology Demonstrates the Absurdity of Lang's Assertion that Plaintiff's Counsel Misrepresented USP 2040

Lang accuses plaintiff's counsel of "wholly fail[ing] to investigate the basis for the alleged false statements about absorption before filing the Complaint in 2013" (Mot. at 16), but the USP 2040 revised introductory language was not even proposed until February 2014. (Allen Decl. ¶ 9 & Ex. 6.) Nor, as Lang admits, had the proposed language become official when plaintiff filed her First Amended Complaint on July 28, 2014 (Dkt. No. 29). And the SAC quoted the revised introduction verbatim. (SAC ¶ 32.) Lang deceptively addresses this inconvenient fact just once, calling paragraph 32 a mere "passing reference" (*id.* at 10), apparently in hopes that such mischaracterization will carry the day when it requests $575,000 of sanctions for "misle[ading] the Court." (Mot. at 14.)

Lang's contention that plaintiff's counsel misled the Court by using customary "true and correct" language when referring to the USP 2040 exhibit attached each pleading is also nonsense. (Mot. at 9, 10, 18, 21.) A document does not stop being a "true and correct copy" of itself just because there is a more recent version (none of plaintiff's complaints alleged that the attached copy was the most recent USP 2040 version). More importantly, immediately

16

after alleging Exhibit 3 was a "true and correct" copy of USP 2040 (SAC ¶ 31), the SAC alleged that "[i]n 2014, USP <2040> was revised to add the . . . Introduction" (*id.* ¶ 32). Plaintiff's counsel could not have both misrepresented that the exhibit was the most recent version *and* alleged that it had been revised almost a year earlier.[6]

## II.      THERE IS NO LEGAL BASIS FOR SECTION 1927 SANCTIONS

### A.      Sanctions are Not Available Because Lang's Motion at Most Raises a Disputed Merits Issue

"Importantly, § 1927 'focuses on the conduct of the litigation and not on its merits.'" *Malibu Media*, 2015 WL 6759448, at *4 (quoting *DeBauche v. Trani*, 191 F.3d 499, 511 (4th Cir. 1999)). "[C]ontention[s] concerning the weaknesses of [plaintiff's] case do[] not fall within the purview of § 1927," *E.E.O.C. v. Great Steaks, Inc.*, 667 F.3d 510, 522 (4th Cir. 2012) (affirming denial of fees where defendant argued that plaintiff "litigated the case even though it lacked a foundation"); *c.f. La. Cmty. Dev. Capital Inv. Fund, Inc. v. Grambling Legends Square Taxing Dist.*, 2015 WL 6554469, at *4 (W.D. La. Oct. 29, 2015) ("A mere 'lack of merit' is not sufficient to justify an award of fees under § 1927." (citing *Ayala v. Enerco Group, Inc.*, 569 Fed. Appx. 241, 251 (5th Cir. 2014))).

Thus, even where a case fails on the merits, sanctions should not be awarded where "that result was not so obvious in advance that it can be inferred that [plaintiff] knowingly or recklessly pursued a futile claim," and where "nothing in the record suggests that [an attorney] did not sincerely believe he was advancing colorable claims." *See Morgan v. County of Yolo*, 277 Fed. Appx. 735, 736 (9th Cir. 2008). In *Morrow v. City of San Diego*, for

---

[6] In contrast to Lang's claim of nefariousness, there is a practical reason for the older version of USP 2040. The USP-NF compendium, whose primary audience is testing laboratories, is very expensive, and generally unavailable online, especially newer versions. After learning of the revision, plaintiff's counsel tried, but was unable to locate a more recent copy. But most USP-NF content does not change radically from year-to-year, and there had indeed been no change to USP 2040 when plaintiff's counsel filed the FAC—only proposed revised introductory language—and no material change since, including when the SAC was filed, because the revised introduction continues to support plaintiff's position that USP test failures evince absorption problems, at least indirectly. (*See* Fitzgerald Decl. ¶ 42.)

*Cortina v. Wal-Mart Stores, Inc. et al.*, No. 13-cv-02054-BAS-DHB
OPPOSITION TO LANG'S MOTION FOR SANCTIONS

example, a court in this district denied § 1927 sanctions because, "[w]hile Plaintiffs dispute certain allegations of the City as unreasonable and vexatious, these alleged statements subject to sanctions are merely Defendant's allegations in defense of its case." 2013 WL 6269401, at *5 (S.D. Cal. Dec. 4, 2013). The same is true here. Lang's sanctions motion hinges entirely on the interpretation and import of USP 2040's introductory language. While Lang's position is untenable, contrary to the testimony of USP expert and even its own witnesses and the documents of its own customers and laboratories, the issue is at most a factual dispute. "Such evidentiary arguments go to the merits of the case, and are therefore beyond the province of § 1927." *See Malibu Media*, 2015 WL 6759448, at *5 (citation omitted).

At bottom, Lang's sanction motion just re-hashes its failed argument to dismiss the FAC. (*See* Dkt. No. 31-1 at 1 ("Plaintiff's claims are all still grounded in the alleged failure of the Equate . . . to pass admittedly <u>voluntary</u> standards set by the [USP] that do not measure the amount of CoQ10 in the bloodstream.").) The Court rejected that argument, explaining:

> the FAC asserts that USP testing provides "objective and scientifically-valid industry standards . . . for comparing two or more products[.]" FAC ¶ 20. Accepting this as true, evidence that Equate is produced in "inconsistent batches" shows that the product compares unfavorably to itself. Based on the allegations in the FAC, in contrast to those in the initial Complaint, USP testing may be relevant for some purposes at trial and may provide evidence supporting the breach of the implied or express warranties made by Defendant.

(Dkt. No. 42 at 7.) The Court further noted that Equate's "invited comparison to Qunol . . . may avail Equate to comparison to the USP monograph because Qunol meets the USP standards." (*Id.*) Notably, USP's August 2014 revision merely "add[ed] clarity as to the chapter's application" (Allen Decl. Ex. 4); it did not substantively change its purpose.

But even if Lang were correct about USP 2040's application to plaintiff's claims, this would still not support § 1927 sanctions for pursuing a "frivolous" case, because USP 2040 testing is just one piece of evidence on which plaintiff will rely at trial. (*See* Fitzgerald Decl. ¶¶ 60-63.) Sanctions requested on the basis that an attorney unreasonably and vexatiously pursued a meritless case should be denied where "plaintiff has sufficient evidence to create a

18

1  jury question on defendant's liability." *See Malibu Media*, 2015 WL 6759448, at *5.

2  ### B.   Sanctions are Not Available for Activities in Other Cases

3       "Sanctions imposed under section 1927 may be imposed only based on activities before

4  the sanctioning court." *Miele v. Franklin Res., Inc.*, 2015 WL 4932566, at *7 (N.D. Cal. Aug.

5  18, 2015) (citing *GriD Sys. Corp. v. John Fluke Mfg. Co., Inc.*, 41 F.3d 1318, 1319 (9th Cir.

6  1994) (per curiam) (citing *Matter of Case*, 937 F.2d 1014 (5th Cir. 1991)))). Lang's motion,

7  however, seeks sanctions based on activities in *Harris* and elsewhere, arguing that:

8       • "Lang has been forced to litigate the same meritless claims in multiple
9         courts for more than two years now." (Mot. at 1.);

10      • Plaintiff's counsel "continued to aggressively litigate this and related
         actions after learning Plaintiff's claims were baseless" (*id.* at 14).

11      • "This court [sic] is permitted to infer that Plaintiff's Counsel's pursuit of
12        harassing discovery and law and motion across four separate cases . . . has
          been solely for the purpose of harassing Lang, driving up costs, and
13        coercing an unwarranted settlement." (*Id.* at 20.)

14      • "Plaintiff's Counsel has aggressively pursued extensive discovery from
15        Lang, in both this action and the related *Harris v. CVS* action," which "has
          required Lang's counsel to . . . conduct extensive document review,
16        respond to extensive law and motion initiated by Plaintiff's Counsel, and
17        prepare many witnesses to respond to more than 80 subject areas in two
          Rule 30(b)(6) notices of deposition, all at great expense to Lang." (*Id.* at
18        19.)

19      This last bit especially gives Lang away. Here in *Cortina*, there has been no "extensive

20  document review," because Wal-Mart produced only 1,554 pages, and Lang none (Lang had

21  already completed its document production in *Harris* when plaintiff served requests in

22  *Cortina*, and with the discovery-sharing agreement there was no need for further production).

23  There has been no "extensive law and motion initiated by Plaintiff's Counsel," because

24  plaintiff has not filed a single adverse motion. And Lang's preparation for its 30(b)(6)

25  deposition through three witnesses also occurred in *Harris*; the parties only agreed to

26  "double-track" those depositions in this *Cortina* action a few days before they occurred. (Nov.

27  16 Fitzgerald Decl. ¶¶ 13-20 & Exs. 6-13.) Such "conduct in other lawsuits is irrelevant to

28  this case." *See Malibu Media*, 2015 WL 6759448, at *4 (denying § 1927 sanctions); *accord*

19

*Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1189 (9th Cir. 2012) (reversing § 1927 sanctions where plaintiff's "attorneys did not file repetitive motions or generate an extraordinary volume of paperwork in this case").

### C.   Lang Shows No Bad Faith, Harassment, or Multiplied Proceedings

"[O]nly conduct rising to the level of maliciousness, vexatiousness or bad faith warrants section 1927 sanctions; negligence—even gross negligence—is not enough." *Blumberg v. Gates*, 152 Fed. Appx. 652, 654 (9th Cir. 2005) (citing *Gomez v. Vernon*, 255 F.3d 1118, 1134-35 (9th Cir. 2001)). Moreover, a party is entitled to § 1927 sanctions "only if [the opposing party's attorney] 'multiplied' the proceedings." *See Schmitzer v. County of Riverside*, 26 Fed. Appx. 701, 702 (9th Cir. 2002).

Lang's motion does not identify a single "multiplied" proceeding supposedly resulting from bad faith conduct, nor could it. To the contrary, plaintiff's counsel *obviated* the need for proceedings duplicative of *Harris*, by agreeing to double-track Lang's 30(b)(6) depositions, and *insisting on* the discovery-sharing stipulation. (Nov. 16 Fitzgerald Decl. ¶ 19 & Ex. 12 at p. 65.) Illustrating the utter dearth of proceedings in *Cortina*—much less multiplied proceedings—although Lang seeks over $500,000 for work since the April 3 SAC, the only proceedings since then, as reflected on the docket, have been: (a) three joint motions to amend the scheduling order in defendants' favor (Dkt. Nos. 54-59); (b) defendants' Answers (Dkt. Nos. 60-61); (c) the discovery-sharing stipulation (Dkt. No. 63-65); and (d) the August 25 settlement conference (Dkt. Nos. 66-70). Similarly, Lang's fifth grounds for sanctions, its contention that plaintiff "attempts to abandon this litigation," leaving her counsel "free[] to re-file again elsewhere" (Mot. at 14), is not cognizable under § 1927, since "abandoning" litigation cannot constitute "multiplication." Moreover, plaintiff's counsel is *always* free to file new lawsuits, and the *Harris* court contemplated continued state court litigation.

Lang also offers no evidence that plaintiff's counsel made filings "for the purpose of harassing an opponent," so as to justify § 1927 sanctions even if meritorious. *See Indus. Tech. Research Inst. v. LG Elecs., Inc.*, 2015 WL 1522947, at *3 (S.D. Cal. Apr. 1, 2015) (quoting *Estate of Blas Through Chargualaf v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986)); *see also*

20

*Kohler v. Flava Enters., Inc.*, 2011 WL 2448338, at *3 (S.D. Cal. June 17, 2011) (a "meritorious filing in bad faith" is one made "with the sole intention of harassing the opposing party" (citing *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010); *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002))). Instead, Lang asks the Court to "infer" a harassing motive from "Plaintiff's Counsel's pursuit of harassing discovery and law and motion across four separate cases, while failing to respond to any other discovery requests" (Mot. at 20).

The only inferences the Court should reasonably draw from the litigation history, however, are, first, that plaintiff's counsel would not have expended such enormous time and effort on contingency fee litigation, or rejected multiple Lang settlement offers in a case counsel subjectively considers meritless, and second, given that the *Harris* discovery motions were necessary and almost entirely successful, plaintiff's counsel have zealously and capably represented California consumers against obstructionist defendants and defense counsel who themselves have caused any unnecessary expense over which Lang complains. Such "aggressive prosecution . . . of [a] case. . . . is not sanctionable under 28 U.S.C. § 1927." *Morrow*, 2013 WL 6269401, at *5; *c.f. Kohler v. Flava Enters., Inc.*, 2012 WL 460455, at *1-2 (S.D. Cal. Feb. 13, 2012) (declining to award sanctions where court was "well-aware of the hotly disputed nature of the claims not only in this case, but also in other cases involving these parties and attorneys"). Tellingly, Lang did not move Judge Rosenberg for § 1927 sanctions. In any event, Wal-Mart's requests were untimely (*see* Nov. 16 Fitzgerald Decl. ¶ 32), and anyway, § 1927 "is not appropriate for" sanctioning discovery conduct regulated under Federal Rules 26 and 37. *In re Yagman*, 796 F.2d 1165, 1187 (9th Cir. 1986).

In sum, sanctions are not warranted because "the record discloses no conduct by plaintiff that multiplied the proceedings unreasonably and vexatiously or that reflects bad faith on the part of plaintiff or its attorney," *see Malibu Media*, 2015 WL 6759448, at *4.

**D.    Plaintiff's Counsel Cannot be Sanctioned for Allegedly Failing to Investigate the Initial Complaint**

Lang requests sanctions against plaintiff's counsel for "fail[ing] to conduct a reasonable investigation before filing the Complaint" (Mot. at 14), but it is well-settled that

21

1  "sanctions under 28 U.S.C. § 1927 do not apply to complaints or initial pleadings," *De Dios*
2  *v. Int'l Realty & Invs.*, 641 F.3d 1071, 1076 (9th Cir. 2011) (citing *In re Keegan Mgmt. Co.*
3  *Sec. Litig.*, 78 F.3d 431, 435 (9th Cir. 1996)); *see also Wilson v. PFS, LLC*, 2008 WL 789898,
4  at *4 (S.D. Cal. Mar. 20, 2008).

5        Moreover, it cannot seriously be disputed that plaintiff's counsel conducted a
6  reasonable, indeed substantial, investigation before filing the Complaint, among other things
7  relying on costly and sophisticated laboratory testing that followed the same USP protocol
8  upon which the industry as a whole relies—including Lang itself and its retailer customers.
9  (*See* Dkt. No. 1, Compl. ¶¶ 3, 32-38 & Exs. 4-5.)

10       **E.    Lang Failed to Mitigate Damages**

11       Lang's delay in seeking any remedy relating to the USP 2040 language it discovered
12 last March precludes sanctions because Lang did not satisfy its "duty to mitigate damages,"
13 *see Pratt v. California*, 11 Fed. Appx. 833, 835-38 (9th Cir. 2001) (citation omitted).

14       **F.    Lang Provides No Evidence of Reasonable Attorneys' Fees and Its $575,000**
15             **Request is Grossly Excessive**

16       "Section 1927 authorizes a taxing of only those excess costs incurred by reason of 'an
17 attorney's unreasonable and vexatious conduct,'" and "'does not authorize imposition of
18 sanctions in excess of costs reasonably incurred because of such conduct.'" *Kirshner v.*
19 *Uniden Corp. of Am.*, 842 F.2d 1074, 1081 (9th Cir. 1988) (quoting *Blodgett*, 709 F.2d at
20 610-11); *see also Nilon*, 2015 WL 6510540, at *6 ("In keeping with its statutory purpose to
21 reduce excess costs, any amount awarded under Section 1927 must reflect fees that were
22 actually and reasonably incurred as a result of the misconduct that multiplies the
23 proceedings." (citing *Yagman*, 796 F.3d at 1184)).

24       Ignoring this well-settled law, Lang does not even try to make a showing of the *specific*
25 work its counsel undertook that *specifically* resulted from supposedly "unreasonable and
26 vexatiously" multiplied proceedings. Instead, Lang requests a staggering $575,000 sanction
27 against three attorneys personally, on its counsel's barebones assertion that "Lang has
28 incurred . . . $575,104.07 in fees and expenses" (Allen Decl. ¶ 13).

Lang's counsel does not attach billing records, identify timekeepers and hours worked, specify tasks performed, or otherwise provide any evidence the time claimed was reasonably spent and the result of sanctionable conduct, making it impossible for the Court to calculate a reasonable sanction even if one was warranted. *See Mirch v. Frank*, 266 Fed. Appx. 586, 588 (9th Cir. 2008) ("Reasonableness is the benchmark for sanctions based on attorneys' fees," and is "determined by following a two-part 'lodestar' approach." (citing *Yagman*, 796 F.2d at 1184-85; 28 U.S.C. § 1927 (authorizing fees "reasonably incurred"); *Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 622 (9th Cir. 1993) (citation omitted))); *see also Jordan v. Multnomah County*, 815 F.2d 1258, 1263 (9th Cir. 1987) ("The fee applicant has the burden of producing satisfactory evidence, *in addition to the affidavits of its counsel*, that the requested rates are in line with those prevailing in the community . . . ." (emphasis added)); *Kilopass Tech., Inc. v. Sidense Corp.*, 82 F. Supp. 3d 1154, 1169 (N.D. Cal. 2015) ("The party seeking fees bears the initial burden of establishing the hours expended litigation the case and must provide detailed time records documenting the tasks completed and the amount of time spent." (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *Welch v. Met. Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007))); *c.f. Sanchez v. Bank of Am.*, 2010 WL 2382347, at *4-5 (N.D. Cal. June 10, 2010) (noting defendant "has not provided the Court with actual billing records from this action" and "[w]hile [defendant's] claimed rates are reasonable, the amount of time [defendant] claims to have spent working on this case is not").

Lang's fee request is dubious. Its motion asserts that while they are "no doubt warranted," it is "not seek[ing] to recover all attorney fees and costs incurred since the outset of the litigation or the fees and costs related to the three other meritless cases filed by Plaintiff's Counsel on nearly identical grounds." (Mot. at 22.) The supporting declaration avers that since August 1, 2014, "Lang has incurred $542,349.00 [in fees] and $32,755.07 [in] travel and other expenses" (Allen Decl. ¶ 13; *see also id.* ¶ 14 (similar)). Both these statements appear to be misrepresentations.

Lang's failure to attach detailed time records suggests defendants have not limited their request to this action, but also surreptitiously seek fees for work done in *Harris*. Defendants'

23

staggering "alternative" request of $501,081.40 (*see* Mot. at 21) supposedly represents $469,199.50 in fees since plaintiff filed her SAC on April 23. (Allen Decl. ¶ 14.) Divided by counsel's $385 hourly rate[7] (*id.*¶ 15), this equates to 1,218.7 hours of work in the 5 months and 17 days between April 23 and November 9, or 218.9 hours per month. But little has happened since April 2015. Wal-Mart responded to discovery and produced 1,554 pages. Lang responded to discovery by interposing only objections, then served supplemental responses that were also not substantive. (Nov. 16 Fitzgerald Decl. ¶¶ 27-28 & Exs. 19-21; Dkt. Nos. 72-7, 72-8.) There has been no adverse motion practice.

In contrast, plaintiff's counsel incurred, from the September 3, 2013 filing through August 20, 2015 (23 months, 17 days), just $241,498.50 in lodestar on 516.8 hours, or 21.9 hours per month, *10%* of the monthly burn Mr. Allen claims his firm performed. (Nov. 16 Fitzgerald Decl. ¶ 29 & Ex. 22.) Moreover, between August 1, 2014 and April 23, 2015 (8 months, 22 days), Lang supposedly incurred just $73,149.50 in fees ($542,349 - $469,199.50, Allen Decl. ¶¶ 13-14), representing 190 hours worked ($73,149.50 ÷ $385/hour), or just 41.4 hours per month—less than 20% of defense counsels' supposed expenditure in the last 5 months. This is despite that defendants during that time filed motions to dismiss and strike (Dkt. Nos. 32-33, 37-38), participated in Rule 26(f) proceedings (*see* Dkt. No. 47), and attended an ENE (*see* Dkt. No. 49). Defendants also seek over $32,000 in "travel and other expenses" (Allen Decl. ¶ 13), but the only travel necessary in the two years *Cortina* has been pending was for the April 3 ENE, and August 25 settlement conference.

Lang also appears to seek fees for unperformed work, namely its counsel supposedly "preparing Walmart personnel in Arkansas in response to Plaintiff Counsel's lengthy Rule 30 (b) (6) notice of deposition" (Allen Decl. ¶ 12). But this either did not, or at least should not have occurred, because the parties agreed on August 11 not to proceed with the deposition

---

[7] In classic obstructionist form, during David Lang's 30(b)(6) deposition, defense counsel instructed Mr. Lang not to identify the total amount Lang had paid its attorneys, nor their rates, on the basis that this information was supposedly "attorney-client privileged." (Fitzgerald Decl. Ex. 44 at 229:14-231:16.)

*Cortina v. Wal-Mart Stores, Inc. et al.*, No. 13-cv-02054-BAS-DHB
OPPOSITION TO LANG'S MOTION FOR SANCTIONS

that was noticed for September 22. (Nov. 16 Fitzgerald Decl. ¶¶ 23-26 & Exs. 16-18.)

Finally, Mr. Allen's statement, that since April 23, "*Lang* has incurred" fees and expenses (Allen Decl. ¶ 13 (emphasis added)), appears, if not literally false, at least misleading. During the August 25 settlement conference, defense counsel advised that insurer Chubb had been paying defense costs since plaintiff's counsel filed *Alvandi* on March 2, 2015, naming Lang as a defendant. (Nov. 16 Fitzgerald Decl. ¶ 30.)

Neither defense counsel nor Chubb responded to subpoenas seeking records that would either confirm or contradict the otherwise unsupported claims in Mr. Allen's declaration. (Fitzgerald Decl. ¶ 64.)

"A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether." *Serrano v. Unruh*, 32 Cal. 3d 621, 635 (1982). Lang's request for over $575,000 in sanctions, including over $540,000 in fees, is unreasonable under any circumstances. Plaintiff's counsel conducted a Westlaw search of all reported Southern District of California cases citing 28 U.S.C. § 1927, and all unreported Southern District cases in which the word "granted" appeared within 50 words of "sanction!" or "1927." Of the 65 hits, only 7 decisions granted § 1927 sanctions, with the amounts ranging from $2,500 to $36,339.29, and averaging $14,500.76 (though several decisions awarded sanctions under both § 1927 and other authority, like Rule 11 or the court's inherent power). (Flynn Decl. ¶¶ 2-4.) Lang's request for $575,104.07 is 39.66 times this average amount.

### G.  Lang Request for $32,755 in "Travel and Other Expenses" is Improper

"Excess costs recoverable under 28 U.S.C. § 1927 include only those taxable costs enumerated in 28 U.S.C. § 1920 (costs taxable to a losing party)." *United States v. Austin*, 749 F.2d 1407, 1408-1409 (9th Cir. 1984) (citing *Roadway Express Inc. v. Piper*, 447 U.S. 752, 757-60 (1980)). Lang only describes its $32,755 request as relating to "travel and other expenses." (Allen Decl. ¶¶ 13-14; *see also* Mot. at 22.) Travel expenses, however, are not taxable under § 1920, and Lang provides no evidence that its "other expenses" are so taxable.

### <u>CONCLUSION</u>

The Court should deny Lang's motion for sanctions.

*Cortina v. Wal-Mart Stores, Inc. et al.*, No. 13-cv-02054-BAS-DHB
OPPOSITION TO LANG'S MOTION FOR SANCTIONS

Dated: November 30, 2015          Respectfully Submitted,

By: /s/ Jack Fitzgerald

**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD
(*jack@jackfitzgeraldlaw.com*)
TREVOR M. FLYNN
(*trevor@jackfitzgeraldlaw.com*)
MELANIE PERSINGER
(*melanie@jackfitzgeraldlaw.com*)
TRAN NGUYEN
(*tran@jackfitzgeraldlaw.com*)
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON
(*ron@consumersadvocates.com*)
SKYE RESENDES
(*skye@consumersadvocates.com*)
ALEXIS M. WOOD
(*alexis@consumersadvocates.com*)
651 Arroyo Drive
San Diego, California 92103
Phone: (619) 696-9006
Fax: (619) 564-6665

***Counsel for Plaintiff***

*Cortina v. Wal-Mart Stores, Inc. et al.*, No. 13-cv-02054-BAS-DHB
OPPOSITION TO LANG'S MOTION FOR SANCTIONS